(No. 78736.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ALDWIN McNEAL, Appellant.

*Opinion filed January 30, 1997.—Rehearing denied March 31, 1997.*

Charles M. Schiedel, Deputy Defender, and John J. Hanlon, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

James E. Ryan, Attorney General, of Springfield,

and Michael J. Waller, State's Attorney, of Waukegan (Barbara A. Preiner, Solicitor General, and Arleen C. Anderson and Penelope Moutoussamy George, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE HARRISON delivered the opinion of the court:

In the circuit court of Lake County a jury found the defendant, Aldwin McNeal, guilty of three counts of first degree murder (720 ILCS 5/9—1(a)(3) (West 1994)) in the deaths of each of two persons, Cory Gerlach and Perry Austin, and two counts of armed robbery (720 ILCS 5/18—2(a) (West 1994)). Prior to trial defendant's case was severed from that of his codefendant, James Woods. At a separate sentencing hearing, the jury found defendant eligible for the imposition of the death penalty and determined further that there were no mitigating factors sufficient to preclude the imposition of that sentence. The circuit court sentenced defendant to death accordingly and to a concurrent term of 30 years in prison for the conviction of armed robbery of Cory Gerlach. Following a hearing the circuit court denied his post-trial motion for a judgment of not guilty notwithstanding the jury's verdict or for a new trial or a new sentencing hearing. The cause comes directly to this court for review (Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d R. 603), where defendant presents eight issues for our consideration. For the reasons that follow, we affirm the judgment of the circuit court.

We turn first to defendant's contention that the trial court erred in denying his motion to suppress as physical evidence a handgun recovered during a warrantless search of one of his garbage cans located outside the townhouse in which he resided. Although the armed robbery and murders of which defendant has been convicted occurred on or about April 7, 1994, the defen-

dant was not implicated in these offenses until tests that were performed upon the handgun seized from his garbage can during an unrelated incident on April 20, 1994, indicated that it was the weapon used to shoot Gerlach and Austin. Defendant maintains that the officer's warrantless search of the garbage can and seizure of the handgun violated his fourth amendment rights because he maintained a reasonable expectation of privacy in the contents of the garbage can, which was situated, he argues, within the curtilage of his residence. The can was sitting on grass about two feet from the sidewalk and was leaning against the back of his townhouse, near the back door and, it seems, near a barbecue grill. Marked with the number of his townhouse, the can had to be wheeled to the edge of the alley in order for the garbage collector to empty it of trash.

At the hearing on his motion to suppress the handgun as evidence, the State argued, as it does here, not only that the defendant had no expectation of privacy in the contents of the garbage can but also that there had been exigent circumstances justifying the officer's search of it. In denying the motion, the trial court found that because the garbage can was located so near the sidewalk the defendant did not have a reasonable expectation of privacy in items placed in it. The court made no finding concerning exigent circumstances to justify the search. However, even if we assume, without deciding, that the defendant did have a reasonable expectation of privacy as to the property seized from the garbage can and to the area searched as being within the curtilage of his dwelling, it is clear that the exigencies of the situation justified the officer's warrantless search of the can and his seizure of a paper bag containing the handgun from it.

At the hearing on this motion, Officer Terry Richards of the Zion police department testified that at about

8:50 p.m. on April 20, 1994, he received a call directing him to the alley behind the defendant's townhouse, which was one of four units in the building. He drove a marked squad car and wore a police uniform. Upon his arrival in the alley, he spoke immediately with two females who met him there. The two told him that they had been in the alley with defendant when an argument had ensued between defendant and one of them, Sophia Degraffenreid, in which defendant had punched Sophia in the neck and had thrown her to the ground. Defendant had asked her if she was going to call the police and had told her he was going to his apartment to get a gun. The two then called the police and, when they saw the squad car come into the alley, went back into the alley, approached Officer Richards, and told him about the incident with defendant.

As they did so, the officer stood with his back to the building containing defendant's townhouse. The officer testified that the two then told him that "Aldwin McNeal had just come out, saw the police, dropped a bag into the garbage can and went back into the door real quick." They described the bag as a brown paper one. Officer Richards then walked over to the apartment and the garbage can, which was, as we have said, about two feet from the sidewalk, opened the can, and saw a brown paper bag resting on top of another bag of garbage near the top of the can. He removed the brown paper bag, opened it, and found a loaded 9 millimeter handgun inside. He unloaded the weapon, secured it, and attempted to make contact at the door of 2136 Hebron, which was defendant's address at the time. When he knocked on the door, James Woods and a woman named Andrea Green answered it.

Officer Richards did not search the other of defendant's garbage cans, explaining, "[T]hey said he stepped out, opened up the garbage can, set the bag in there,

went back inside, so I checked that garbage can." Officer Richards was familiar with this area from his duties as a police officer and knew that children live, as he said, "in that entire block" and that members of the public, including children, use the sidewalk near the garbage can regularly at that time of the evening. The defendant was not arrested concerning any conduct alleged with respect to Sophia Degraffenreid on April 20, 1994.

The physical entry of the home is the chief evil against which the fourth amendment is directed. *Payton v. New York*, 445 U.S. 573, 585, 63 L. Ed. 2d 639, 650, 100 S. Ct. 1371, 1379-80 (1980). A basic principle of fourth amendment law is that searches and seizures inside a home without a warrant are presumptively unreasonable. *Payton*, 445 U.S. at 586, 63 L. Ed. 2d at 651, 100 S. Ct. at 1380. The curtilage, that is, the land immediately surrounding and associated with the home, has been considered part of the home itself for fourth amendment purposes, and courts have extended fourth amendment protection to it. *Oliver v. United States*, 466 U.S. 170, 180, 80 L. Ed. 2d 214, 225, 104 S. Ct. 1735, 1742 (1984). "In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Payton*, 445 U.S. at 590, 63 L. Ed. 2d at 653, 100 S. Ct. at 1382. Between the intrusiveness of entries to search and entries to arrest no constitutional difference exists. *People v. Abney*, 81 Ill. 2d 159, 166 (1980). "[A]ny differences in the intrusiveness of entries to search and entries to arrest are merely ones of degree rather than kind. The two intrusions share this fundamental characteristic: the breach of the entrance to an individual's home." *Payton*, 445 U.S. at 589, 63 L. Ed. 2d at 652-53, 100 S. Ct. at 1381.

The State bears the burden of demonstrating exigent need for a warrantless search or arrest. *People v. Foskey*, 136 Ill. 2d 66, 75 (1990). Where the facts and the credibility of the witnesses are undisputed, as here, the question of whether exigent circumstances are present is a question of law, subject to consideration by this court *de novo. Abney*, 81 Ill. 2d at 168. While each case must be decided on the basis of the facts presented (*Abney*, 81 Ill. 2d at 173), factors that this court has considered relevant to a determination of exigency in circumstances involving warrantless entry into a private residence to effectuate an arrest include whether: (1) the crime under investigation was recently committed; (2) there was any deliberate or unjustified delay by the police during which time a warrant could have been obtained; (3) a grave offense was involved, particularly a crime of violence; (4) there was reasonable belief that the suspect was armed; (5) the police officers were acting on a clear showing of probable cause; (6) there was a likelihood that the suspect would escape if he was not swiftly apprehended; (7) there was strong reason to believe the suspect was in the premises; and (8) the police entry was made peaceably, albeit nonconsensually (*People v. Williams*, 161 Ill. 2d 1, 26 (1994)). Insofar as these factors are relevant to the circumstances involved in Officer Richards' search of the defendant's garbage can, we consider them here, bearing in mind that the fundamental guiding principle is reasonableness, in accord with constitutional provisions governing searches and seizures (*Williams*, 161 Ill. 2d at 26). No list of factors bearing on exigent circumstances is exhaustive (*Foskey*, 136 Ill. 2d at 75), and these factors are merely guidelines rather than cardinal maxims to be applied rigidly in each case. *People v. White*, 117 Ill. 2d 194, 216-17 (1987). To determine whether the police acted reasonably, the court must look to the totality of the cir-

cumstances confronting the officers at the time the entry was made. *Williams*, 161 Ill. 2d at 26. These circumstances must militate against delay and justify the officers' decision to proceed without a warrant. *Foskey*, 136 Ill. 2d at 75.

In the instant case, the officer had reason to believe that in his presence defendant was furthering the criminal activity under investigation. Officer Richards engaged in neither deliberate nor unjustified delay during which time a search warrant could have been obtained. Indeed, he acted immediately upon hearing that the defendant had emerged from his residence, seen the police, dropped a brown paper bag into the garbage can, and retreated hastily inside. A crime of violence was involved in which, after having allegedly punched Degraffenreid in the neck and thrown her to the ground, defendant had inquired whether she was going to call the police and had told her that he was going to his apartment to get a gun. This conduct and threat had prompted the call to police. Very shortly after having made this threat, the defendant was observed to engage in behavior consistent with carrying it out. Having probable cause to believe that a crime was being committed and that the garbage can contained evidence of crime, the officer peaceably lifted the lid of the garbage can, removed the brown paper bag, examined its contents, and found a loaded handgun.

Prior to ascertaining the contents of the paper bag, Officer Richards could not know with certainty whether the bag contained the gun defendant had said he was going to get from his apartment or whether defendant might be yet in the process of making good on his promise to obtain it with the result that the complainant and, possibly, her companion as well as others might be in danger of attack with it by the defendant. Although defendant argues that the officer could have as-

sured the safety of passersby had he remained where he was while others attempted to secure a warrant to search the garbage can, such an approach could not have alleviated any danger that during such time the defendant might, in fact, be armed, as he had said he would be, and might injure others. The officer limited his search to the garbage can in which defendant had reportedly deposited the brown paper bag and to the brown paper bag itself, in accord with the principle that warrantless police action must be strictly circumscribed by the exigencies that justify its initiation (*Abney*, 81 Ill. 2d at 173-74). We conclude that under the totality of the circumstances confronting the officer at the time the entry into defendant's garbage can was made, the officer acted in a reasonable fashion. Because exigent circumstances justified his decision to proceed without a search warrant, there was no constitutional infirmity in the warrantless search and seizure challenged here. Therefore, the trial court did not err in denying defendant's motion to suppress the handgun as physical evidence.

Some of the evidence adduced at trial includes the following. The bodies of the two victims, who were friends, were found lying face down on the floor in the back of Maude's Pizza in Waukegan at about 3 a.m. on April 8, 1994, when friends of Cory Gerlach noticed that the lights were on and stopped to see if Cory, who was the manager there, was cleaning the restaurant. Both men had been shot in the back of the head, Austin at near contact or very close range and Gerlach at contact range with the bullet passing first through his right hand, which had been raised to the back of his head. Usually Maude's closed between 11:30 p.m. and midnight. Between 11:20 and 11:30 p.m. on April 7, Gerlach bought a six-pack of beer from a neighboring bar and liquor store and visited with the bartender for about five to seven minutes. At about 11:34 p.m. a person parked in front of the liquor store heard a "bang."

Defendant's wife, Regina, identified the handgun retrieved from their garbage can as defendant's. She testified to having entered a plea of guilty to the "felony charge of unlawful use of weapons" in this case because she had bought bullets for defendant on April 5, 1994, at his request. On April 7 defendant and James Woods, who was living with the McNeals at the time, picked her up from work in Waukegan at about 10:45 p.m. in her automobile, a black Mustang that had been blue. Defendant, who was wearing a blue pullover, is taller and thinner than Woods. As Regina McNeal drove, defendant said that he had to make a stop and told her to drive into an alley, which was located near Maude's Pizza. She thought that he was going into the nearby liquor store and stopped the car near it. However, defendant said he was not going into the liquor store and "had to do something that he had to do right then and there." She responded by saying that she wanted him to take her home because she "didn't want to get caught up in his bullshit." When he said he could not take her home, that what he had to do he had to do then, she and defendant argued. Upon his instructions, she backed the car down the alley under a light pole and into a space near a row of stores. As defendant and Woods were getting ready to leave the car, defendant told Woods to "get the stuff." When Regina told defendant she was leaving, he told her to take the car. As defendant and James Woods were getting out of the car and going toward the trunk and as she herself was about to get out of the car, she observed a light on in a third-floor apartment and a woman in the window. Defendant and Woods then went in the direction of a business, and Regina walked north about a mile and a half to the home of defendant's brother Tyron and his wife.

At their home Regina told Tyron's wife, Cecilia, that she and defendant had argued and asked if she could

use their telephone to call a cab. After calling the cab, she and Cecilia talked for about 20 or 30 minutes, whereupon defendant arrived and told her to come with him. After calling the cab to cancel it, she left with defendant, who was in her car with James Woods. In the car Regina noticed on the driver's side of the back seat what she thought was some stereo equipment, which she had not seen before defendant's arrival at Tyron's house. On North Avenue defendant, who was driving, stopped by the side of the road, and he and Woods "threw some things out." When the three arrived home, she went to bed, but defendant and Woods went out. She recognized the stereo receiver that was in evidence as one she had first noticed in her apartment about two days after this incident.

On April 23, 1994, officers searched defendant's apartment and found in the living room of it Gerlach's Yamaha stereo receiver, the serial number of which had been scratched off. The model number of the receiver, which was identified as Gerlach's, was the same as that on the owner's manual to such a stereo unit found at Maude's Pizza.

Cecilia McNeal testified that at about midnight or in the early morning of April 8, 1994, defendant's wife came alone to her house, asked to call a cab, and waited for it to arrive. When the defendant arrived later in a "blue" car, came in the house, and asked Regina to come with him, Regina did so. Although Regina called the cab company back upon Cecilia's request, the cab had already arrived.

The parties stipulated that if the taxicab driver dispatched by Lake County Transportation were called as a witness, he would testify that on April 7, 1994, at 11:51 p.m. a telephone request was received for a taxicab to be sent to 2205 North Jackson Street in Waukegan, which is the address of Tyron and Cecilia McNeal, to

pick up Regina McNeal, to take her to the 2100 block of Hebron Avenue in Zion, which was the address of Regina and defendant at the time. When the driver arrived at 2205 North Jackson, within five minutes of having received the dispatch at 12:07 a.m., he found no one outside waiting for a cab. However, at 12:15 a.m. the driver received a communication from headquarters canceling the request.

The parties stipulated further that if Marge Ponzio were called as a witness, she would testify that on or about April 9, 1994, she was walking along North Avenue between Yorkhouse Road and Blanchard Road when she found a book of checks with the business name of Maude's Pizza, a check-cashing card bearing the name of Cheryle Brown, who was the owner of Maude's Pizza and the mother of Cory Gerlach, several business cards of Cheryle Brown, a roll of pennies, and other miscellaneous items. The items she found were entered into evidence.

Penny Lee Hill testified that at the time in question she lived in a third-floor apartment in a building connected to Maude's Pizza. A light illuminated the parking lot for her building. At about 11:15 to 11:20 p.m. on April 7, 1994, she was sitting near the window in her living room while watching a movie on television, when she noticed what appeared to be a two-door black car driving down the alley with its lights off. The car proceeded to the other side of a telephone pole and then backed in. After the car backed in, the witness saw two men come away from the car, turn around, and then face the car, as though they were talking to someone. She saw nothing in their hands at that time. The taller and thinner of the two men wore a "bluish-colored coat" with a hood, which he put up as he was looking around. The two men walked in the direction of Maude's Pizza.

The witness called 911 and when the police re-

sponded, spoke with them; the police were in the area for about 5 or 10 minutes. A "couple minutes" after the police left, she saw the shorter of the two men walking empty-handed, followed shortly thereafter by the taller of the two carrying what appeared to be "pieces to stereos." The taller man opened the door to the passenger side of the car, moved the bucket seat forward, and put what he was carrying in the back seat. The taller of the two started the car and drove into the alley towards Jackson, not turning his lights on until he reached Jackson where he turned north. At the police station the witness later identified this vehicle, which was Regina McNeal's Mustang. The witness never saw a third person leave the vehicle or walk down the alley. Around the time the two men walked away from the car, however, the witness looked away to watch television for a "couple minutes."

Mary Bearden, who is the mother of defendant's daughter, testified that shortly after 1 a.m. on April 8, 1994, defendant came to her apartment and asked her if she would hold some stereo equipment. When she refused to do so, he left.

Jimmy Gilmore, who had dated defendant's mother, testified that "some days" before the defendant was arrested on April 26, 1994, the witness had asked him what had happened and that defendant had responded, in the words of the witness, "[T]hey drove there during the time when he was going to pick up his wife and they went in and something was said or whatever, anyway, they ended up in the back room or something, and that's when he told me that he shot the people." At a later time defendant indicated that he had taken out of Maude's Pizza, Gilmore stated, "some stuff that I had bought from Woods, and I asked him did it come out of there and he said yeah." The witness said that a Yamaha receiver was part of the "merchandise" that he

had bought. The defendant indicated further to the witness that he had covered his face when he had gone into Maude's Pizza; that James Woods had been present; that the gun had been "[s]ome inches or so" from the victims when defendant shot them; that when he shot the victims, they were lying on the floor and defendant was holding them down with his foot; and that one of the victims, in the words of the witness, "had tried to pull up or something like that," as the defendant was shooting him. Upon cross-examination the witness stated that during the week this conversation took place he was using cocaine, marijuana, and alcohol daily, that he considered himself to have been a drug addict, and that these substances "messed up" his mind.

A police officer testified that at about 11:29 or 11:30 p.m. he had received a dispatch of a possible burglary taking place near Maude's Pizza and that at about 11:32 p.m. he had driven in the alley behind the apartment building connected to Maude's Pizza. He walked through the alley all the way to the front of Maude's Pizza, where he noticed that the lights were on and heard loud music, circumstances that were not unusual, so he left. He noticed a Mustang backed into a spot behind an antique shop there and identified it as the same vehicle portrayed in a photograph of Regina McNeal's automobile.

Tyron McNeal testified that on the night in question, when his wife responded to the doorbell, he recognized the voice of Regina McNeal. Later that night defendant came to the door, and he and Regina left together. About three days later Tyron, who was at the time a deputy in the Lake County sheriff's department, went to defendant's house to talk to him in an unplanned visit. When Tyron asked defendant if he had been "involved in that thing down at the pizza place," defendant "kind of walked away." When Tyron asked

defendant the question again, defendant responded, "Yes." Tyron testified further that in response to his question, "Why?" defendant "said something about the guy was a drug dealer and owed some money." At a later time he spoke to defendant about turning himself in, but the defendant wanted to do so later, after May 1, 1994.

Jennifer Giles, 15 years old at the time of trial in January of 1995, testified that she had been with the defendant on March 28, 1994, at the Pizza House Restaurant in Zion when defendant fired the handgun in evidence. Michael Zervos, the manager of the Pizza House Restaurant on that date, testified concerning that incident, as did the police officer who recovered an empty shell casing and a fired projectile from the restaurant following the incident.

Officer Richards, 16-year-old Sophia Degraffenreid, and her companion at the time defendant threatened to get a gun from his apartment, 14-year-old Shammara Evans, testified concerning the circumstances associated with the recovery of the gun from defendant's garbage can. A forensic scientist expressed the opinion that a fired projectile found in the kitchen of Maude's Pizza had come from the semi-automatic pistol identified as defendant's, as had the two shell casings found in the vicinity of the bodies, a fragment of a projectile taken from the body of Gerlach, a fragment of a projectile taken from the body of Austin, a shell casing recovered from the Pizza House Restaurant on March 28, 1994, and a fired 9 millimeter projectile taken from the stairwell wall of defendant's apartment.

The defendant contends that his trial lacked the fundamental fairness implicit in constitutional guarantees of due process of law because of the State's failure to correct certain testimony of his wife concerning her plea agreement with the State. During direct examina-

tion of this witness, she testified that conditions of her plea agreement were that she would not be sent to the Illinois Department of Corrections, that she could be sentenced to up to a year in jail for that offense, and that she would testify truthfully in the instant case. Upon cross-examination the following colloquy between defense counsel and the witness took place concerning part of her plea agreement:

"Q. Wasn't it also part of the agreement that there will be no further charges filed against you in the case where Perry Austin and Corey Gerlach were killed? Wasn't that also part of the agreement?

A. I never even remembered them physically charging me with it.

Q. I'm not saying that you were ever charged.

A. Okay.

Q. I am not saying that at all. But wasn't part of the agreement when you pled guilty on May 20th of 1994 that you would not be charged with anything further in relation to this incident, is that correct?

A. I don't recall that."

When on May 20, 1994, Regina McNeal entered her negotiated plea of guilty to the charge of unlawful possession of firearm ammunition by a felon, namely, Aldwin McNeal, based upon a theory of accountability, she affirmed the trial court's understanding that as part of the plea agreement the State would not charge her "with anything else concerning the incident where Perry Austin and Cory Gerlach were killed."

Relying on the proposition that the prosecution in a criminal case is obligated to correct the testimony of its witnesses when it knows that testimony to be false (see *People v. McKinney*, 31 Ill. 2d 246 (1964); *People v. Lueck*, 24 Ill. 2d 554 (1962)), defendant maintains that a new trial must be ordered because a key component of Regina McNeal's plea agreement was the State's promise not to prosecute her for any offense arising out of the incident at Maude's Pizza, she "denied" this por-

tion of the agreement, and the State made no attempt to correct this "falsity." He avers that the jury should have been allowed to judge the credibility of this "critical" witness with the knowledge that the State had agreed to forgo prosecution of her completely for any part she might have played in this incident. He argues that the error was significant and, citing *People v. Jimerson,* 166 Ill. 2d 211 (1995), that it was not harmless.

In *Jimerson* we determined that, under the particular facts of that case, the error could not be considered harmless because the State failed to prove beyond a reasonable doubt that it did not contribute to the jury's verdict. *Jimerson,* 166 Ill. 2d at 228. The only evidence to link the defendant in *Jimerson* to the crimes of which he was convicted was the testimony of Paula Gray, whose denials of a deal between the prosecutor and herself were deemed false. Here, by contrast, the testimony of Regina McNeal is not the only evidence linking the defendant to the offenses committed at Maude's Pizza. Notably, some of the other evidence consists of inculpatory statements made by the defendant as well as ballistics evidence. Furthermore, the testimony of other witnesses corroborated Regina McNeal's testimony in several important respects. We assume *arguendo* that Regina McNeal testified falsely when she stated that she did not "recall" this condition of her plea agreement, while we acknowledge the State's argument to the contrary. However, under these circumstances and in light of the extensive evidence of defendant's guilt apart from that afforded by Regina McNeal's testimony, we conclude that the State has proved beyond a reasonable doubt her uncorrected testimony concerning this condition of her plea agreement did not contribute to the jury's verdict and such error was, at most, harmless.

In the third issue defendant presents for our review,

he maintains that the trial court erred in denying his motion *in limine* to exclude as inadmissible certain testimony of Tyron McNeal on the basis of the clergyman's privilege set forth in the Code of Civil Procedure (735 ILCS 5/8—803 (West 1994)). Defendant takes the position that his statements to Tyron, which he sought to exclude, were made while Tyron was serving in his "professional character" and in his role as a "spiritual advisor." As a consequence, defendant urges, the trial court should not have compelled Tyron to disclose any of defendant's statements to him, and the error requires a new trial. Section 8—803 of the Code of Civil Procedure provides:

> "A clergyman or practitioner of any religious denomination accredited by the religious body to which he or she belongs, shall not be compelled to disclose in any court, or to any administrative board or agency, or to any public officer, a confession or admission made to him or her in his or her professional character or as a spiritual advisor in the course of the discipline enjoined by the rules or practices of such religious body or of the religion which he or she professes, nor be compelled to divulge any information which has been obtained by him or her in such professional character or as such spiritual advisor." 735 ILCS 5/8—803 (West 1994).

With respect to the defendant's motion *in limine*, Tyron McNeal testified that while he was in the United States Army in Germany, he became a member of the Church of the Second Coming in 1982 and, later, a minister in that church. There was no ordination procedure in this nondenominational Christian church; one became a minister by receiving one's calling from God and by being confirmed by the pastor. Tyron has continued to be a minister. In the United States he has taught Sunday school, was a superintendent of Sunday school at Mount Zion Baptist Church in Zion, Illinois, and has continued to be a spiritual advisor. Sometime in 1982 or 1983, while he was still in Germany, he began

to be a spiritual advisor to the defendant, who turned to Tyron regularly when he needed spiritual advice. In April of 1994, Tyron testified, defendant turned to him for guidance and advice. Asked whether this spiritual advice was in relation to an incident that had happened at Maude's Pizza, the witness responded, "Yes, some of it." By "some of it," the witness explained, "Well, it was—some of it was about that, but most of it was about his relationship with God. That was my main concern was him getting right with God."

On cross-examination the witness testified that when he returned to the United States from Germany, he was no longer a member of the Church of the Second Coming, since he had moved out of the area and there was no chapel in Waukegan, and he became a member of the Mount Zion Baptist Church, of which he was a member in April 1994. Tyron testified that the first time he had talked to his brother about the killings at Maude's Pizza, about three days after they had occurred, he had visited his brother and had "grabbed" him and asked him if he had been involved in the killings. When he was talking to him about what had happened at Maude's Pizza, he asked defendant why he had done it and defendant had told him that "the guy was a drug dealer," or "something to that effect," and that he "owed him some money or something like that." When Tyron had spoken to his brother at a later time, he had found defendant in Zion and had talked to him about getting him to turn himself in to the police and about what defendant wanted to do with regard to the Maude's Pizza case. He testified that he had chastised defendant at that time about how "stupid what he had done was, the thing that he did, and how he ha[d] gotten everybody else involved." Tyron stated that after his brother had been arrested in this case, Tyron had testified before the Lake County grand jury about these conversations with

defendant in the days following the murders at Maude's Pizza and had not asserted at that time that he was acting as a minister in any way on the occasions of these conversations. The transcript of proceedings before the grand jury on April 27, 1994, when Tyron McNeal testified before it, was admitted into evidence with respect to defendant's motion *in limine.*

In ruling on the defendant's motion, the trial court found, "based on his [Tyron's] word I suppose, that he is a practitioner of the Church of the Second Coming, although it wasn't established that that has any presence in the United States other than him. I will accept that he is a practitioner of that religious denomination." The court found further that he was "accredited by it, although I think it's pretty tentative evidence to say the least on that. I am willing to accept that." The court found as well that the defendant had met the requirement that disclosure be enjoined by the rules or practices of the religious body or religion professed, although the court found that evidence "also very, very shallow to meet that requirement." However, the trial court was unable to find that the information here was obtained in Tyron McNeal's professional character or as a spiritual advisor, as section 8—803 requires. The trial court discussed some of the facts it considered in making that finding, among them the fact that during the first conversation the witness "grabbed the person [defendant] and asked him if he did it, and that was about the end of the conversation." Also persuasive to the trial court was the fact that the witness had disclosed "much, if not all," of these conversations during the grand jury proceedings "without claiming the privilege, mentioning the privilege or even putting up a mild protest about disclosing these things he says his religion prevents him from disclosing." Of significance to the trial court was the further fact, contained in the transcript of the grand

jury proceedings, that when the witness asked defendant "why he had shot those people" at Maude's Pizza, the witness was somewhat uncertain of defendant's response, stating, " 'I don't know. I don't know what he said. I wasn't even listening. I was too upset. He said something about the guy owed him money or something. I wasn't even listening. I was too upset.' "

The party asserting the privilege must establish all the elements thereof before it may be successfully invoked. See *People v. Diercks*, 88 Ill. App. 3d 1073, 1078 (1980). The finding of the trial court in this regard will not be disturbed unless it is against the manifest weight of the evidence. See *Diercks*, 88 Ill. App. 3d at 1078. The trial court assessed the evidence pertaining to each element of the privilege and examined with particular care that pertaining to the final element. Contrary to defendant's assertion, its finding that the defendant failed to establish that his statements were made to Tyron in his professional character or as a spiritual advisor was plainly not against the manifest weight of the evidence, and we will not disturb it. Consequently, the trial court properly denied defendant's motion *in limine* to exclude Tyron's testimony concerning defendant's statements to him pursuant to section 8—803.

Defendant contends next that he was denied a fair jury verdict and his constitutional right to effective assistance of counsel because the verdict forms that were submitted to the jury concerning each of the three theories of first degree murder as to each victim set forth some but not all of the elements of that offense. The six verdict forms returned by the jury state as follows: (1) "We, the jury, find the defendant, Aldwin McNeal, Guilty of the offense of first degree murder (was committing the offense of robbery) of Corey Gerlach"; (2) "We, the jury, find the defendant, Aldwin McNeal, Guilty of the offense of first degree murder (knowing his

acts created a strong probability of great bodily harm) of Corey Gerlach"; (3) "We, the jury, find the defendant, Aldwin McNeal, Guilty of the offense of first degree murder (intended to kill) of Corey Gerlach"; (4) "We, the jury, find the defendant, Aldwin McNeal, Guilty of the offense of first degree murder (was committing the offense of robbery) of Perry Austin"; (5) "We, the jury, find the defendant, Aldwin McNeal, Guilty of the offense of first degree murder (knowing his acts created a strong probability of great bodily harm) of Perry Austin"; and (6) "We, the jury, find the defendant, Aldwin McNeal, Guilty of the offense of first degree murder (intended to kill) of Perry Austin."

Defendant argues that these verdict forms are fatally defective for failing to include "the *first* proposition for murder, *i.e.*, 'that the defendant, or one for whose conduct he is legally responsible, *performed the acts which caused the death*' of each victim" and for failing to inform the jury that the mental state must have existed " 'when' " the acts were committed. (Emphasis in original.) Defendant maintains further that defense counsel's failure to object to these improper verdict forms constituted ineffective assistance of counsel. He relies principally upon our opinion in *People v. Mack*, 167 Ill. 2d 525 (1995), in which the verdict finding the defendant eligible for the death penalty attempted to set forth a statutory aggravating factor but failed to do so completely because it omitted an essential element. In *Mack* the verdict stated, " 'We, the jury, unanimously find beyond a reasonable doubt that the following aggravating factor exists in relation to this Murder: Larry Mack killed Joseph Kolar in the course of an Armed Robbery.' " *Mack*, 167 Ill. 2d at 529-30. The defective verdict in *Mack* failed to specify that the defendant had acted with the requisite mental state of intent or knowledge as required under section 9—1(b)(6)

of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)(6)).

As we stated in *Mack*, the test of the sufficiency of a verdict is whether the intention of the jury can be ascertained with reasonable certainty from the language used. *Mack*, 167 Ill. 2d at 537. In determining the meaning of a verdict, all parts of the record will be searched and interpreted together. *Mack*, 167 Ill. 2d at 537. A verdict should have a reasonable intendment and receive a reasonable construction; it should not be set aside unless from necessity originating in doubt as to its meaning, or because of the immateriality of the issues found, or because of a failure to find upon a material issue involved. *Mack*, 167 Ill. 2d at 537. Where a verdict purports to set out the elements of the offense as specific findings, it must do so completely or be held insufficient, and a verdict that finds the accused guilty of only a certain part of an offense amounts to an acquittal of the residue. *Mack*, 167 Ill. 2d at 537-38. However, it is well established that a general verdict of "guilty in manner and form as charged in the indictment" or simply "guilty" is sufficient to sustain a conviction, as is a verdict identifying the offense by name. *Mack*, 167 Ill. 2d at 538.

In the instant case each of the verdicts in question identifies the offense of which the defendant is found guilty by name: first degree murder. The jury was instructed that

> "[a] person commits the offense of first degree murder when he kills an individual, if, in performing the acts which cause the death,
>
> > he intends to kill that individual; or he knows that such acts create a strong probability of great bodily harm to that individual; or he is committing the offense of robbery."

The jury was also instructed concerning the two propositions that the State must prove to sustain the charge of

first degree murder, including, as the first, "[t]hat the defendant, or one for whose conduct he is legally responsible, performed the acts which caused the death" of each named victim and, as the second proposition, "[t]hat when the defendant, or one for whose conduct he is legally responsible, did so, he intended to kill" each named victim; "or he knew that his acts created a strong probability of great bodily harm to" each named victim; "or he was committing the offense of robbery." The trial court instructed the jury further that "[t]he defendant is charged in different ways with the offense of first degree murder ***."

Whereas in *Mack* there was a discrepancy that might have confused jurors between the verdict form and other instructions, no discrepancy exists here. The parenthetical material on each of the six verdict forms refers to one of three different ways in which the defendant was charged with the offense of first degree murder as to each of the two victims, ways that are explained in other instructions to the jury in conformity with the phrases in parentheses on the verdict forms. Were this parenthetical material to be deemed a finding by the jury as to but a single element of the offense or a finding of guilt as to only a part of it, the jury's finding concerning defendant's guilt of the named offense of first degree murder would be rendered surplusage, an unreasonable, even absurd, construction. The meaning of the verdict and the intention of the jury is as plain as the language of each verdict finding him guilty of the offense of first degree murder. Thus, the challenged verdict forms were neither insufficient nor improper. That being so, defendant was denied neither a fair jury verdict nor the effective assistance of counsel as a consequence of counsel's failure to object to the verdict forms.

In the fifth issue defendant raises for review, he contends that a new sentencing hearing is warranted

because repeated remarks of the prosecutors to the jury that defendant would kill in prison if given any sentence other than death were improper, particularly where there was no evidentiary basis for such argument. The first of the three remarks about which defendant complains is this request of the prosecutor: "I ask you not to put him in our prison system and keep him in our prison system to be violent." The latter two were made during the State's closing argument in rebuttal:

"And I suppose it would be something else if you could insure yourselves that he wouldn't do this again. But he is not sorry and you can't assure yourselves that he won't do this again, even in prison. Not only can you not assure yourselves that he won't do it again, but the evidence that you have received, which is what you are supposed to consider here, indicates the otherwise [sic]."

"And how any person here can think that we are not unleashing a hellion to the Department of Corrections forever, I don't know. ***

*** He is in prison for life. There isn't any good time to take away from him. Now he has killed two people since the last time he has been in prison. He has had the opportunity and the experience of watching people squirm when shotguns were put in their mouths and guns put to their heads with the fingers on the trigger clicking away, those people not knowing if they are about to have a projectile rip through their skulls like Perry Austin did and Corey Gerlach. That man is in prison.

That man perhaps is going to have a shiv [a knife] again, like we know he did have that one occasion. Maybe there will be a dispute. Is there a person here who can't say that he would hesitate to kill? I don't know how you could."

Although the defendant made no objection to any of these comments when they were made, he did raise the issue of their impropriety in his post-trial motion. In denying that motion, the trial court made four findings concerning this issue: (1) that there was no objection; (2) that there was evidence to support "some argument as

far as future violent conduct of killing or acts that endanger people's lives"; (3) that in the course of these arguments the prosecutors did say that they were making the arguments on the basis of inferences drawn from the evidence; and (4) that even if the State's argument were improper or based insufficiently upon the evidence, it would not have caused the jury to make its decision on anything other than the evidence.

Although defendant avers that this issue is preserved for review by virtue of his "very specific and lengthy post-trial motion and arguments relative to this claim," the State asserts correctly that defendant's failure to raise contemporaneous objections to these remarks constitutes a waiver of the issue on appeal. See *People v. Herrett*, 137 Ill. 2d 195, 209 (1990). Defendant points out that at the hearing on his post-trial motion each of defendant's attorneys indicated that the failure to make a contemporaneous objection was an oversight and stated unequivocally that it was not a matter of strategy. In the alternative, defendant asks this court to review the question under the doctrine of plain error, pursuant to Supreme Court Rule 615(a) (134 Ill. 2d R. 615(a)), which allows a court of review to consider an alleged error that has not been preserved properly for review where the evidence is closely balanced or where the error is so fundamental and of such magnitude that the accused was denied a fair trial. *People v. Edgeston*, 157 Ill. 2d 201, 239-40 (1993). Where it is necessary to preserve the integrity of the judicial process and to insure a fair hearing, the plain error rule is applicable. *People v. Pitsonbarger*, 142 Ill. 2d 353, 402 (1990). Although our review discloses that application of the rule is unwarranted, we elect to consider the merits of defendant's claim concerning these alleged prosecutorial improprieties.

In closing argument parties may not go beyond the

scope of the evidence presented and facts fairly inferable therefrom. *People v. Holman*, 103 Ill. 2d 133, 163 (1984). In the absence of supporting evidence, a prosecutor may not speculate before a sentencing jury that a defendant may commit future crimes if he is not sentenced to death. *People v. Hudson*, 157 Ill. 2d 401, 457 (1993). Speculating on the possibility that the defendant might commit future crimes if he is not executed may cause the jury to focus upon a possibility that may or may not occur and is immaterial to the jury's consideration of aggravating and mitigating factors. *Pitsonbarger*, 142 Ill. 2d at 401. However, each instance of error of this kind must be examined with respect to the facts of the case and in the context of the closing argument as a whole. *Edgeston*, 157 Ill. 2d at 241.

At the outset, we observe that the first of the remarks defendant finds objectionable was made following the prosecutor's comment upon the testimony of Dr. Lawrence Heinrich, a clinical psychologist who had examined defendant and whom defendant had called to present evidence in mitigation. Dr. Heinrich testified, among other things, that he had diagnosed the defendant as having an antisocial personality disorder, which he describes as "what we commonly characterize as the criminal-type personality, one that seems to lack conscience, that seems to take advantage of other people, that in this possibly even being aggressive, sadistic—it's basically characterized by longstanding conflicts with the law from the time of adolescence throughout adulthood, and that's certainly true in Mr. McNeal's case." On cross-examination Dr. Heinrich indicated that a description of antisocial personality disorder includes the adjectives "mean" and "violent." Dr. Heinrich testified at length concerning the report of a test he had given defendant, the Millon Clinical Multi Axial Inventory, and stated, *inter alia*, that he thinks defendant is

"brutal" toward other people and that defendant can be "dangerous," "[e]ven in an institutional setting." During closing argument the prosecutor referred expressly, and properly, to this testimony of the defendant's expert witness in making the first of these three remarks:

> "And the doctor himself told you that he can even be violent in prison.
>
> I ask you not to put him in our prison system and keep him in our prison system to be violent."

During the course of closing argument, the State ranged broadly over the wealth of evidence amassed in aggravation against the defendant, stressing the evidence of his criminal past, his history of sadistic and increasingly violent behavior, his lack of remorse, and his attitude and conduct while incarcerated. We need not set forth in detail all of the evidence adduced in aggravation and mitigation. It is sufficient to say that the evidence marshalled against the defendant in aggravation far outweighed that which he presented in mitigation. With respect to the latter two comments, to the extent that the prosecution overstated the evidence or drew from it inferences so expansive that they amounted to speculation, its argument was improper. However, in light of the evidence, any such excess on the part of the State was relatively slight, in part because of Dr. Heinrich's testimony bearing upon defendant's future dangerousness in prison. Under the circumstances here the two remarks could not have diverted the attention of the jury from considering the aggravating and mitigating factors presented by the case, the character and record of the defendant, or the nature and circumstances of his offense. See *Holman*, 103 Ill. 2d at 164. Considering these two comments in the context of the closing argument in its entirety and all of the evidence adduced in aggravation and mitigation, we conclude that the State has proved beyond a reasonable doubt that the error complained of did not contribute to the

verdict and was, thus, harmless. See *Satterwhite v. Texas*, 486 U.S. 249, 256, 100 L. Ed. 2d 284, 293, 108 S. Ct. 1792, 1797 (1988).

As his sixth contention of error, defendant maintains that the death penalty statute in Illinois violates the eighth and fourteenth amendments by placing a burden of proof on the defendant that precludes meaningful consideration of evidence in mitigation. Defendant puts forth essentially the same arguments advanced unsuccessfully by the defendant in *People v. Hampton*, 149 Ill. 2d 71 (1992), in which this court pointed out it has held repeatedly that the death penalty statute does not impose a constitutionally impermissible burden upon a defendant. We decline to revisit the issue.

Similarly, by way of his seventh contention of error, defendant challenges the constitutionality of the death penalty statute in Illinois as violative of the eighth and fourteenth amendments for failing to minimize sufficiently the risk of arbitrarily or capriciously imposed sentences of death. He acknowledges that this court has considered individually several issues he sets forth in this regard but asks us not only to reconsider these claims but also to consider whether in their totality the features and omissions he cites render the statute unconstitutional. In the absence of any persuasive argument to consider anew the individual constitutional defects he identifies, we decline to do so. Likewise, this court has previously rejected the argument that the cumulative effect of such features and omissions renders the statute constitutionally infirm (*People v. Phillips*, 127 Ill. 2d 499, 542-43 (1989)), and defendant presents nothing new that persuades us to reconsider this conclusion.

In a supplemental brief defendant contends that it was eighth amendment error, requiring a new sentencing hearing, for the prosecutor to argue in closing at the

aggravation and mitigation phase of his hearing that his antisocial personality disorder constituted evidence in aggravation. The precise comments to which defendant objects are these:

"And what is antisocial personality disorder? It's just being mean and violent is what it comes down to, and he told you that.

Basically what it comes down to is the person we have here, the doctors can put it into fancy words, the fancy words being antisocial personality disorder or whatever else they want to pick out of their book, but the bottom line is the character of this man, his meanness, his violence, his sadism. That's not a mitigating factor. That's an aggravating factor. It's not a mitigating factor that he has an antisocial personality disorder. It's an aggravating factor. It shows you how violent he can be. And the doctor himself told you that he can even be violent in prison."

Defendant describes as his "most important" evidence in mitigation Dr. Heinrich's testimony that he suffered from the statutory mitigating factor of an "extreme mental or emotional disturbance" (720 ILCS 5/9—1(c)(2) (West 1994)), a primary component of which was his antisocial personality disorder. He maintains that his "mental illness" cannot be considered as aggravation because it did not develop as a consequence of any fault on his part and he cannot be blamed for that which is beyond his control. In short, he argues, his "mental illness cannot be used to justify his execution."

In order to meet constitutional standards, a capital sentencing hearing must permit individualized consideration of the offender and the offense. *Hudson*, 157 Ill. 2d at 454. In accord with that requirement, the sentencer in a capital case may not be precluded from considering, or refuse to consider as a matter of law, any relevant mitigating evidence offered by the defense. *Hudson*, 157 Ill. 2d at 454; *People v. Page*, 155 Ill. 2d 232, 279 (1993). Allowing the sentencer to consider all relevant mitigat-

ing evidence satisfies the requirement of individualized sentencing in capital cases. *Page*, 155 Ill. 2d at 279.

However, these requirements do not oblige a prosecutor to agree with the defendant that evidence offered in his behalf is sufficiently mitigating to preclude imposition of the death penalty or that it is even mitigating at all. *Hudson*, 157 Ill. 2d at 454. Nor is it improper for a sentencer to consider a defendant's evidence presented in mitigation as a factor in aggravation. *Hudson*, 157 Ill. 2d at 455. Just as the sentencer may determine the weight to be given relevant mitigating evidence, the prosecutor may contest during the sentencing hearing the significance or weight of the defendant's evidence presented in mitigation and disagree with a defendant's assessment of the nature and character of it. See *Page*, 155 Ill. 2d at 279-80.

We find particularly instructive *People v. Henderson*, 142 Ill. 2d 258 (1990), in which the defendant argued that the trial court wrongly judged the significance of evidence of his traumatic childhood and turbulent family history and that, to a substantial extent, he was the "involuntary product" of an extremely violent and dysfunctional family environment, involuntary because he had chosen neither his relatives nor his upbringing. This court in *Henderson* pointed out that, contrary to the assertions of the defendant, the Supreme Court has indicated that evidence of an upbringing that has caused a defendant to become violent and aggressive can be considered in aggravation, for one duty of a sentencer is to predict a defendant's future behavior based upon his past behavior. *Henderson*, 142 Ill. 2d at 339, citing *Skipper v. South Carolina*, 476 U.S. 1, 5, 90 L. Ed. 2d 1, 7, 106 S. Ct. 1669, 1671 (1986). Inasmuch as a defendant's upbringing is no more within his control than is an antisocial personality disorder, it is not unreasonable to conclude that it too may be considered in aggravation.

Also in *Henderson* this court considered *Penry v. Lynaugh*, 492 U.S. 302, 328, 106 L. Ed. 2d 256, 284, 109 S. Ct. 2934, 2951-52 (1989), in which the trial court erred by failing to instruct the jury that it could consider and give effect to the mitigating evidence of defendant's mental retardation and abused background. There was evidence in *Lynaugh* that the defendant's mother had beaten him about the head with a belt as a child and that he was moderately retarded and unable to learn from experience. *Penry*, 492 U.S. at 308-09, 106 L. Ed. 2d at 271-72, 109 S. Ct. at 2941. The Supreme Court recognized that "Penry's mental retardation and history of abuse is thus a two-edged sword: it may diminish his blameworthiness for his crime even as it indicates that there is a probability that he will be dangerous in the future." *Penry*, 492 U.S. at 324, 106 L. Ed. 2d at 281, 109 S. Ct. at 2949. As we noted in *Henderson*, the Court in *Penry* stated neither that this evidence was inherently mitigating and the sentencer was required to consider it as such nor that it would be improper to consider this evidence in aggravation as it indicated that the defendant had a violent nature not amenable to rehabilitation. *Henderson*, 142 Ill. 2d at 340. We think that by analogy the same conclusion can be reached here and that defendant's antisocial personality disorder is, likewise, a double-edged sword for purposes of mitigation and aggravation.

Further, as this court stated in *People v. Coleman*, 168 Ill. 2d 509, 537 (1995), while evidence of any mental or emotional problems that afflict a capital defendant is critically important to the sentencing decision, not every mental or emotional condition that can be classified as a "disorder" will necessarily be mitigating. In *Coleman* the affidavit of a clinical psychologist submitted in support of the defendant's post-conviction petition indicated that the defendant had developed charac-

teristics of personality likely to be viewed as aggravating rather than mitigating, specifically, a lack of empathy and lack of guilt or anxiety attached to illegal or antisocial behaviors; in *Coleman* we concluded that it was not clear the expert testimony would have produced a profile that the jury would have viewed in an entirely sympathetic light. *Coleman*, 168 Ill. 2d at 537-38.

In the instant case, the State's characterization of defendant's evidence of antisocial disorder as aggravating rather than mitigating in no way restricted the jury's individualized consideration of the defendant and the offenses he had committed. The State's argument neither limited the defendant's presentation of any of his evidence in mitigation nor precluded the jury's consideration of it. At no time did the State suggest to the jury that the law did not allow it to consider this evidence in mitigation (see *People v. Bean*, 137 Ill. 2d 65, 126 (1990)), and defendant makes no claim that the jury was not properly instructed by the trial court concerning consideration of it. Referring to details of Dr. Heinrich's testimony, the prosecutor merely disagreed with the defendant's characterization of that evidence as mitigation, as he is permitted to do. The jury as sentencer was allowed to consider all relevant mitigating evidence the defendant presented so that the requirement of individualized sentencing was satisfied. Hence, the prosecutor's characterization of defendant's antisocial personality disorder as a factor in aggravation did not deprive defendant of a fair and reliable sentencing hearing and occasioned no eighth amendment error.

Therefore, for the reasons stated above, we affirm the judgment of the circuit court of Lake County. We hereby direct the clerk of this court to enter an order setting Wednesday, May 14, 1997, as the date on which the sentence of death entered by the circuit court of Lake County is to be carried out. The defendant shall be

372

executed in a manner provided by law (725 ILCS 5/119—5 (West 1994)). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution where defendant is now confined.

*Affirmed.*