No. 2--04--1030                                    filed: 11/20/06

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE | ) | Appeal from the Circuit Court |
| OF ILLINOIS, | ) | of Kane County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 03--CF--866 |
| | ) | |
| DERRON M. JOHNSON, | ) | Honorable |
| | ) | Timothy Q. Sheldon, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE GILLERAN JOHNSON delivered the opinion of the court:

Following a jury trial, the defendant, Derron Johnson, was convicted of first-degree murder (720 ILCS 5/9--1(a)(2) (West 2002)) and sentenced to 27 years' imprisonment. On appeal, the defendant argues that (1) the trial court erred in denying his motion to quash his arrest due to lack of probable cause; (2) his trial counsel was ineffective for not seeking to quash his arrest for being in violation of Payton v. New York, 445 U.S. 573, 585, 63 L. Ed. 2d 639, 650, 100 S. Ct. 1371, 1379-80 (1980); and (3) the trial court erred in not suppressing his statement as being involuntary. We affirm.

I. BACKGROUND

On May 21, 2003, the defendant was charged by indictment with the first-degree murder of John Szilage (720 ILCS 5/9--1(a)(2) (West 2002)) and the concealment of Szilage's death (720 ILCS 5/9--3.1(a) (West 2002)). The indictment alleged that the defendant struck and killed Szilage sometime between November 30, 2002, and April 14, 2003, knowing that such an act created a

strong probability of great bodily harm. The indictment further alleged that the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty.

On July 8, 2003, the defendant filed a motion to quash his arrest, arguing that the police had neither a warrant, exigent circumstances, nor probable cause to arrest him. On August 20, 2003, the trial court conducted a hearing on the defendant's motion. Prior to the hearing, the parties stipulated that on April 15, 2003, at about 9:30 a.m., Officer Greg Spayth of the Aurora police department went to the defendant's house, with a picture of the defendant. He did not have a warrant. Upon seeing the defendant through the front screen door, Officer Spayth asked him if he was "Derron." After the defendant indicated that he was, Officer Spayth entered the house and arrested him.

At the hearing, Aurora police officer Robert Wallers testified that the victim's body was found in a garbage can behind a garage at 122 North Blackhawk Street on April 14, 2003. The victim had been placed in the garbage can headfirst. The victim's father had reported his son missing on February 6, 2003. The victim was 22 years old, was 5 feet 9 inches tall, and weighed 200 pounds. The victim lived at the Blackhawk Street address, with Andrew Proctor and James Thompson. Thompson told the police that Proctor was a friend of the defendant. Thompson indicated that the victim did not like the defendant because the defendant was black. Officer Wallers also learned from another acquaintance of Proctor's that Proctor and the victim had problems.

Officer Wallers testified that Proctor was brought in for questioning on April 15, 2003, at 2 a.m. Officer Wallers indicated that Proctor was a suspect in the victim's murder. At 4:25 a.m., Proctor gave a statement that implicated the defendant in the victim's murder. This statement was videotaped. Proctor indicated that the victim was a Vice Lord and that the defendant was a Gangster Disciple. The victim and the defendant would frequently "disrespect" each other.

Proctor further indicated that, on December 8, 2002, the victim was doing laundry in the basement of his house. When the victim went upstairs, the defendant hit him in the head with a baseball bat. After the victim fell down the stairs, the defendant followed him and continued to hit him with the bat about 6 to 12 times. The defendant then proceeded to stuff a sock in the victim's mouth and used a broomstick to suffocate him. After the victim died, Proctor assisted the defendant in putting the victim's body in a garbage can. The victim's body was put in headfirst, and clothes were put on top of it. Proctor and the defendant then moved the garbage can behind the garage.

After he had finished interviewing Proctor, Officer Wallers contacted Officer Spayth and instructed him to pick up the defendant. Officer Spayth then came in from his residence to the police station and picked up a picture of the defendant. Officer Wallers informed Officer Spayth that he wanted the police to set up surveillance at the defendant's house.

Nancy Rodarte, a juvenile investigator with the Aurora police department, testified as to her previous contacts with Proctor and the defendant. She testified that she had previously investigated a forgery case involving the defendant and Proctor. In that case, on October 25, 2002, the defendant had tried to cash a check that he had forged. Proctor had stolen that check from Thompson and given it to the defendant. Also on October 25, 2002, Rodarte testified, she had investigated a separate case involving the defendant and Proctor regarding a theft that had occurred at the house of Proctor's father. Rodarte testified that she assisted Officer Wallers in interviewing Proctor on April 15.

At the close of the hearing, the trial court determined that the police had probable cause to arrest the defendant. Relying on People v. House, 141 Ill. 2d 323 (1990), and People v. James, 118 Ill. 2d 214 (1987), the trial court found that because Proctor had implicated himself as being involved in the victim's murder, his statement was reliable. The trial court also found that Proctor's

statement was consistent with what the police had learned through their investigation. Additionally, the trial court found that Proctor's statements were reliable because the police were aware that the defendant and Proctor had previously committed crimes together. Based on all these factors , the trial court denied the defendant's motion to quash his arrest.

On October 16, 2003, the trial court conducted a hearing on the defendant's motion to suppress his statement. Officer Spayth testified that, on April 15, 2003, he went to the defendant's house, with the defendant's picture. While conducting surveillance, he observed the defendant walk onto the front porch. The defendant walked back into the house after spending a couple of minutes on the telephone. Officer Spayth then coordinated with the other officers present and approached the defendant's house.

Officer Spayth knocked on the front door. As he knocked, he observed the defendant sitting on the couch about five feet inside the door. He asked the defendant if he was "Derron," and the defendant indicated that he was. Officer Spayth then opened the door, walked in, and took the defendant into custody. This occurred at approximately 9:30 to 9:35 a.m. Officer Spayth further indicated that the defendant's mother was present when he entered the house.

Officer Spayth, along with another detective, then transported the defendant to the police station. Lieutenant Powell transported the defendant's mother to the station, in a separate car. At 10:30 a.m., the defendant was read his Miranda rights. Officer Harold Carter, a juvenile officer, was present to read the rights and confirm that the defendant could read and write English. The defendant and his mother both signed a form waiving the defendant's rights.

After the defendant had waived his Miranda rights, Officer Spayth began questioning him. Officer Spayth told the defendant that Proctor had indicated that the defendant was involved in the

victim's murder. The defendant denied any involvement in the murder. Officer Spayth indicated that other people had implicated the defendant in the victim's death. He also told the defendant that the police had his fingerprints and physical evidence implicating him. On cross-examination, Officer Spayth acknowledged that, in fact, no one else had implicated the defendant in the murder and the police did not yet have any fingerprints or physical evidence connecting him to the crime.

Officer Spayth left the room and then returned with a television, videocassette recorder, and videotape. The defendant continued to deny any involvement in the victim's murder. Officer Spayth then played the part of Proctor's recorded statement indicating that the defendant had hit the victim on the head. The defendant indicated that Proctor was lying. At about 10:55 a.m., the questioning stopped at the request of the defendant's mother. Then, from 11:05 a.m. to 12:05 p.m., the defendant made a statement explaining his involvement in the victim's murder. After making his statement, the defendant was informed that he could be charged as an adult.[1]

Officer Spayth testified that he resumed questioning of the defendant at 6:45 p.m. A juvenile officer showed the defendant the Miranda form and told him that he could still invoke those rights.

---

[1] The defendant made his statement prior to the effective date of section 5--401.5 of the Juvenile Court Act of 1987 (705 ILCS 405/5--401.5 (West 2004)), which requires the electronic recording of statements that minors under the age of 17 make during custodial interrogations, unless certain exceptions apply. The defendant's statement was also made before section 103--2.1 of the Code of Criminal Procedure of 1963 (725 ILCS 5/103--2.1 (West 2004)) became effective. This section provides that statements that one accused of first-degree murder makes during a custodial interrogation shall be presumed to be inadmissible unless an electronic recording is made of the interrogation. 725 ILCS 5/103--2.1(b)(1) (West 2004).

The questioning stopped at 7:10 p.m. at the request of the defendant's mother. At 7:17 p.m., the questioning resumed. The defendant's mother stopped the questioning at 7:25 p.m. and requested a lawyer.

Tiffany Johnson testified that she was the defendant's mother. She was with the defendant when he was being interrogated. She stopped the first interview for 10 minutes to talk to the defendant alone so that she could "ask him what was going on, because [she] didn't know what was going on." During the second interview, in the evening, she also requested a short break to talk with her son. Shortly after the police resumed questioning, the defendant's mother requested that the interview be stopped, and she also requested to have a lawyer. At this point, all questioning stopped. She estimated that the second interview lasted 30 minutes.

On November 12, 2003, the trial court denied the defendant's motion to suppress his statement. The trial court found that the defendant made his statement freely, voluntarily, intelligently, and without compulsion or inducement of any kind.

Prior to trial, the State nol-prossed count II of the indictment, which alleged that the defendant had concealed the victim's homicide. Between May 17 and May 20, 2004, the trial court conducted a jury trial on the charge of murder. The State argued that the defendant was guilty of first-degree murder on an accountability theory.

Thompson testified that he owned the house at 122 North Blackhawk. The victim moved in with him on September 1, 2002. Proctor moved in with him on September 17, 2002. Thompson explained that he had known Proctor since Proctor was a young child. He was a friend of Proctor's family. Proctor moved in with him because Proctor's family thought it might help Proctor with some of the school and other problems that Proctor was having. Proctor had his own bedroom in Thompson's house, while the victim slept on a couch. Thompson last saw the victim on about

November 30, 2002. Thompson saw Proctor with the defendant frequently, and he was aware that they were friends. Proctor moved out of the house around April 1, 2003. On April 14, 2003, Thompson discovered at the back of his house a human foot protruding from a garbage can. He then immediately called the police.

Officer Spayth testified that he arrested the defendant at his home at 122 Cross Street in Aurora. Juvenile Officer Harold Carter read the Miranda rights to the defendant. Both the defendant and his mother acknowledged his rights and signed a waiver form. The defendant admitted that he knew the people who lived at 122 Blackhawk, including the victim. The victim used to "get with" Proctor's sister. The defendant stated that he had not seen the victim for a while. Officer Spayth then told the defendant that people had implicated him in the murder of the victim and that there was evidence including fingerprints. Officer Spayth admitted that these statements were untrue. Rather, the statements were a technique to see how the defendant would react. The defendant continued to deny his involvement in the crime.

Officer Spayth then showed the defendant part of Proctor's videotaped statement. After seeing the statement, the defendant indicated that Proctor was lying. The defendant then explained that Proctor had called him on the morning of the murder, telling him that he wanted to kill the victim for trying to date Proctor's sister. After the defendant made that statement, Officer Spayth indicated, the defendant's mother briefly stopped the questioning. When the questioning resumed, the defendant stated that Proctor wanted to kill the victim because the victim was a Vice Lord and wanted to date Proctor's sister. Proctor then asked the defendant to come over and help him kill the victim. The defendant and Proctor then developed a plan to kill the victim. According to this plan, the defendant would go over to the victim's house and knock on the door. The victim would come

up from the basement. When the victim answered the door, Proctor would sneak up behind him and hit him on the head with a bat.

The defendant indicated that when he went over and knocked on the door, there was no response. Proctor then appeared and yelled for the victim. The victim came to the door, saw the defendant, and turned away. Proctor then hit the victim on the head with a bat, causing him to fall down the stairs. The defendant then stepped inside the house. He observed Proctor follow the victim downstairs with the bat. He observed that the victim was at the bottom of the stairs and bleeding from the head. The victim appeared to be having seizures, and his body was trembling. The defendant then stepped outside and sat on a bench, as he did not want to go down to the basement and deal with the situation. He remained outside for 20 to 30 minutes and could occasionally hear the victim screaming.

After that time had passed, Proctor came up and asked the defendant to help him because he believed that the victim was almost dead. The defendant then went down to the basement and observed that the victim was extremely bloody from the head and face, but he was not dead yet. The defendant observed that Proctor had found a sock and used a stick to push it down the victim's throat. After about five minutes, Proctor grabbed a hose, put it in the victim's mouth, and turned on the water. The victim stopped moving, and the defendant helped Proctor clean up the area.

The defendant indicated that Proctor then brought a garbage can inside. He and Proctor then rolled the body into a curtain and put it into the garbage can, headfirst. They piled some clothes on top of the body and dragged the can upstairs and outside. Proctor put the garbage can next to the garage. Proctor and the defendant then placed a motorcycle to block the path to the garbage can. Later, they ran into their friend Anthony. Proctor bragged about killing the victim. Officer Spayth testified that the tone of his interview with the defendant was conversational.

At 12:05 p.m., Officer Spayth informed the defendant and his mother that he would have to remain in custody while the police gathered more information. At about 6:45 p.m., Officer Spayth again talked to the defendant. At that point, the defendant repeated that he did not actually strike the victim himself and reiterated that his previous statement was true.

Anthony Jackson testified that both Proctor and the defendant told him that they had killed the victim. Jackson testified that he did not believe them.

Dr. Bryan Mitchell, a coroner's physician for Kane County, performed an autopsy on the victim's body on April 15, 2003. The only injuries he observed were to the face and head. He found eight blows to the head. Dr. Mitchell believed that the injuries were made with a blunt cylindrical object, like a bat, and also something with an edge, like a two-by-four or a hammer. Dr. Mitchell opined that the victim died from multiple blunt force trauma due to an assault.

Carlos Soto testified that the defendant told him about hearing the victim's screams when Proctor killed the victim. The defendant also told Soto where he and Proctor had hidden the victim's body.

Alicia Louis and Kenesha Bolden both testified on behalf of the defense. Both testified that Proctor had admitted killing the victim.

Edward Lesure also testified to having heard Proctor brag about killing someone. On direct examination by defense counsel, Lesure testified that Proctor had stated that the defendant had participated in the killing of the victim.

The defendant testified on his own behalf. The defendant denied knowing that Proctor was going to kill the victim. The defendant also denied making a plan with Proctor to kill the victim.

At the close of the trial, the jury found the defendant guilty of first-degree murder. After denying the defendant's posttrial motion, the trial court sentenced the defendant to 27 years'

imprisonment. After his motion to reconsider sentence was denied, the defendant filed a timely notice of appeal.

## II. DISCUSSION

### A. Lack of Probable Cause

The defendant's first contention on appeal is that the trial court erred in denying his motion to quash arrest. The defendant argues that his motion should have been granted because the police lacked probable cause to arrest him. Specifically, the defendant contends that the police did not have probable cause because the arrest was based entirely on the unreliable and uncorroborated statement of Proctor.

In order to effect a valid warrantless arrest, a police officer must have probable cause. People v. Sims, 192 Ill. 2d 592, 614 (2000). Probable cause exists when the totality of the facts and circumstances known to the officer is such that a reasonably prudent person would believe that the suspect is committing or has committed a crime. People v. Montgomery, 112 Ill. 2d 517, 525 (1986). Mere suspicion is inadequate to establish probable cause to arrest, but the evidence relied upon by the arresting officer does not have to be sufficient to prove guilt beyond a reasonable doubt. Sims, 192 Ill. 2d at 614-15. Probable cause may be based on an informant's tip and, if the facts supplied in such a tip are essential to a finding of probable cause, the tip must be reliable. People v. Patterson, 282 Ill. App. 3d 219, 227 (1996). One indicium of reliability of information exists when the facts learned through police investigation independently verify a substantial part of the informant's tip. People v. James, 118 Ill. 2d 214, 225 (1987). The reliability of the informant is another factor to be considered. People v. Adams, 131 Ill. 2d 387, 397 (1989). The reliability of the informant's tip is enhanced if he implicates his own involvement in the crime at issue. People v.

House, 141 Ill. 2d 323, 369-70 (1990). A trial court's finding of probable cause is reviewed de novo. Ornelas v. United States, 517 U.S. 690, 698, 134 L. Ed. 2d 911, 920, 116 S. Ct. 1657, 1663 (1996).

Here, we believe that the statement Proctor gave to the police was sufficiently reliable to provide the police with probable cause to arrest the defendant. The police knew that Proctor, the victim, and Thompson had lived together at the same house. The police also knew that Proctor was a friend of the defendant and that they had previously committed the crimes of theft and forgery together. One of these crimes had been committed against Thompson. Furthermore, Proctor's statement placed him at the scene of the murder and as a participant in trying to conceal the murder. Proctor's statement was also consistent with what the police had learned from the crime scene, namely, that the victim's body had been placed headfirst in a garbage can behind a garage. Based on the totality of the circumstances, the police had probable cause to believe that the defendant had committed a crime and to effectuate an arrest.

In so ruling, we note that the defendant raises three specific reasons why Proctor's statement was not reliable: (1) the police knew very little about Proctor; (2) the police believed that Proctor was the one who actually killed the victim; and (3) Proctor placed the entire blame for the murder on the defendant. We find each of the defendant's objections to be without merit. First, Proctor was someone with whom the police were familiar. From information provided by juvenile officer Rodarte, the police knew that Proctor and the defendant had previously committed crimes together. The police also knew through Thompson's statements that Proctor and the defendant each had a relationship with the victim.

Second, although Officer Wallers testified that the police had information that suggested that Proctor killed the victim, this was before Proctor was questioned. This original information that the

police had did not in and of itself undermine the reliability of the statement that Proctor subsequently gave to them.

Third, although Proctor did not implicate himself in the victim's murder, he placed himself at the scene of the crime and gave significant details as to how the murder occurred. He also implicated himself in the concealment of that homicide. Concealment of a homicide is a Class 3 felony that carries with it a sentencing range of two to five years' imprisonment. 720 ILCS 5/9--1 (West 2002); 730 ILCS 5/5--8--1(a)(6) (West 2002). Common sense indicates that Proctor's acknowledgment that he was involved in a felony is something he would not do lightly or falsely. See House, 141 Ill. 2d at 369-70. As such, we find without merit the defendant's contention that Proctor's statement was not reliable.

### B. Ineffective Assistance of Counsel

#### 1. Failure to argue lack of exigent circumstances

The defendant's second contention on appeal is that he received ineffective assistance of counsel. Specifically, the defendant argues that, because he was arrested without a warrant and in the absence of exigent circumstances, his counsel was ineffective for not seeking to quash his arrest on those grounds. The defendant further argues that his counsel was ineffective at trial for eliciting testimony from a witness implicating him in the victim's murder.

In order to succeed on a claim of ineffective assistance of trial counsel, a defendant must satisfy the two-pronged test set forth in Strickland v. Washington, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). People v. Enis, 194 Ill. 2d 361, 376-77 (2000). The defendant must establish both that counsel's representation fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's errors, the outcome of the proceeding would have been different. People v. Little, 335 Ill. App. 3d 1046, 1052 (2003). A reviewing court

may dispose of an ineffectiveness claim on the prejudice prong alone by determining that the defendant was not prejudiced by counsel's representation. People v. Munson, 171 Ill. 2d 158, 184 (1996).

The physical entry of the home is the chief evil against which the fourth amendment is directed. Payton v. New York, 445 U.S. 573, 585, 63 L. Ed. 2d 639, 650, 100 S. Ct. 1371, 1379-80 (1980). "Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." Payton, 445 U.S. at 590, 63 L. Ed. 2d at 653, 100 S. Ct. at 1382. The State bears the burden of demonstrating an exigent need for a warrantless search or arrest. People v. Foskey, 136 Ill. 2d 66, 75 (1990). Where the facts and the credibility of the witnesses are undisputed, the question of whether exigent circumstances are present is a question of law, subject to consideration by this court de novo. People v. McNeal, 175 Ill. 2d 335, 345 (1997).

Although each case must be decided on its own facts, the Illinois Supreme Court has recognized the following factors as relevant to a determination of exigency in circumstances involving a warrantless entry into a private residence to effectuate an arrest: (1) whether the crime was committed recently; (2) whether there was any deliberate or unjustified delay by the police during which time a warrant could have been obtained; (3) whether the crime was grave or violent; (4) whether there was a reasonable belief that the suspect was armed; (5) whether the police were acting on a clear showing of probable cause; (6) whether there was a likelihood that the suspect would escape if he was not swiftly apprehended; (7) whether there was strong reason to believe that the suspect was on the premises; and (8) whether the police entry was made peaceably, albeit without consent. McNeal, 175 Ill. 2d at 345. No list of factors bearing on exigent circumstances is exhaustive, and these factors are merely guidelines rather than the cardinal maxims to be applied rigidly in each case. McNeal, 175 Ill. 2d at 345. A court must consider the totality of the

circumstances confronting the police at the time they entered the home and determine whether they acted reasonably. McNeal, 175 Ill. 2d at 345-46. These circumstances must militate against delay and justify the officers' decision to proceed without a warrant. McNeal, 175 Ill. 2d at 346.

The balance of these factors supports the police conduct here. First, we note that the victim's murder had been recently discovered. On April 14, 2003, the victim's body had been found in a garbage can. At 4:25 a.m. on April 15, 2003, an acquaintance of the defendant's implicated him in the victim's murder. Although it had been over four months since the victim had been murdered, the police had learned only hours before arresting the defendant that the murder had occurred and that the defendant may have been involved. The law is clear that "[e]xigent circumstances may arise *** not only immediately after the perpetration of the crime, but also when additional facts justify immediate action." People v. Cobb, 97 Ill. 2d 465, 486 (1983) (while the arrest of the defendant occurred three weeks after the crimes, it was within minutes after the police received new material information establishing probable cause to believe that the defendant committed the offenses); see also People v. Williams, 315 Ill. App. 3d 22, 39 (2000) (finding that this factor was satisfied because police made arrest within four hours after obtaining probable cause, even though crime had occurred five days earlier). Thus, we find that this factor weighs in favor of the State.

Second, there was no deliberate or unjustified delay by the officers during which time a warrant could have been obtained. Shortly after Proctor implicated the defendant in the victim's murder, the police left the station to arrest the defendant. "As the time between when the police formulate probable cause and when the defendant is arrested grows longer, the 'exigency' of the situation is certainly diminished." People v. Smith, 152 Ill. 2d 229, 249 (1992).

Third, the crime here was both violent and grave. The victim was struck in the head with a baseball bat 6 to 12 times. He was knocked down a flight of stairs. A sock was then stuck in his

mouth, and he was suffocated with a broom. A running hose was then put in his mouth and left there until it was apparent that he had died.

Fourth, there is nothing in the record to suggest that the police had reason to believe that the defendant was armed. Nonetheless, even if the officers did not have reason to believe that the defendant was armed, they still had reason to believe that he was violent. See People v. Sakalas, 85 Ill. App. 3d 59, 66 (1980) (exigent circumstances existed partly because the officers knew that the defendant had used a pipe to violently beat the victim, even though they had no reason to believe that he was armed when arrested).

Fifth, the police had probable cause to arrest the defendant. The police knew that the defendant had a prior relationship with the victim and with Proctor. The police knew that Proctor and the defendant had previously committed crimes together. Proctor implicated the defendant in the victim's murder and gave the police details of the murder that were consistent with what the police had already discovered in their investigation. Proctor also implicated himself in the attempt to conceal the homicide.

Sixth, we believe that there was a reasonable likelihood that the defendant would flee if not swiftly apprehended. We believe that the seriousness of the crime at issue is relevant to the analysis of this factor. The penalty for murder, as opposed to a lesser crime, cannot be overlooked as a motive for flight. Conscientious police officers also would not have ignored the likelihood that the defendant would learn that the victim's body had been discovered and that the police were interviewing Proctor. See Cobb, 97 Ill. 2d at 486 (the fact that an accomplice was arrested gave rise to the possibility that the defendant would be alerted to the accomplice's interrogation, giving the defendant the incentive to either flee or prevent his peaceful arrest); see also People v. Hoddenbach, 169 Ill. App. 3d 499, 505 (1988) (police could reasonably have considered the possibility that the

defendant was aware that another person involved in the crime had spoken with the police, thereby causing the defendant to flee the area).

As to the seventh and eighth factors, the police had strong reason to believe that the defendant was on the premises. The police, shortly after interviewing Proctor, placed the defendant's house under surveillance and in fact had observed the defendant in the house. The police entry was also made peaceably. The defendant stipulated that Officer Spayth came to his door. Upon seeing him, Officer Spayth asked him if he was "Derron." After the defendant indicated that he was, Officer Spayth entered the house and arrested him. We conclude that the arrest of the defendant was "reasonable" in light of the exigent circumstances. Thus, the defendant was not arrested in violation of the fourth amendment. Because exigent circumstances existed, the defendant did not receive ineffective assistance of counsel by trial counsel's failure to raise this issue in his motion to quash arrest. See Munson, 171 Ill. 2d at 184.

In so ruling, we find the defendant's reliance on People v. White, 117 Ill. 2d 194 (1987), to be unpersuasive. In that case, the supreme court affirmed the trial court's decision that exigent circumstances were not present to justify the murder suspect's warrantless arrest in his home. White, 117 Ill. 2d at 217, 228. In White, nearly two weeks had elapsed since the murders, the police had probable cause shortly after the killings to believe that the defendant was involved, and after learning of the defendant's possible residence, they still did not pursue him for an additional three days. White, 117 Ill. 2d at 217-18. Conversely, in the instant case, the police placed the defendant's house under surveillance shortly after learning that he may have been involved in the victim's murder, and they arrested him a few hours thereafter. Unlike in White, there is no indication in the record that the police delayed at all in searching for the defendant after they had probable cause to arrest him.

2. Ineffective Examination of Edward Lesure

We next address the defendant's contention that his counsel was ineffective for eliciting testimony from Lesure that the defendant assisted Proctor in killing the victim. The defendant contends that such testimony could not have been elicited as a matter of trial strategy, because there was little other evidence connecting him to the crime. The defendant further argues that the testimony was prejudicial because it was improper hearsay testimony that could not be tested by cross-examination.

During defense counsel's cross-examination of Lesure, the following colloquy ensued:

"Q. Let's get back to what Proctor said. Did Proctor ever say in your presence how he killed the guy?

A. No. That was all rumors.

Q. Okay. Did Proctor ever say that [the defendant] helped him kill the guy?

A. Let me--yeah, he did say that."

We agree with the defendant that the cross-examination of Lesure was inappropriate. Nonetheless, we do not believe that this testimony was sufficiently prejudicial to warrant reversal in light of the other evidence that established the defendant's guilt. See People v. Pizano, 347 Ill. App. 3d 128, 140-41 (2004). As will be explained below, the defendant's statement to Officer Spayth was properly admitted. In that statement, the defendant acknowledged that he and Proctor had come up with a plan to kill the victim and that he in fact assisted in that plan. Thus, Lesure's testimony at issue was only cumulative to the defendant's own incriminating statements. Accordingly, the defendant is not entitled to relief on this ground. See Pizano, 347 Ill. App. 3d at 140-41 (even though defense counsel elicited incriminating testimony from the defendant, defense counsel was not ineffective because testimony was not prejudicial in light of the overwhelming evidence that established the defendant's guilt).

Furthermore, we note that defense counsel generally provided adequate representation for the defendant throughout the proceedings. Defense counsel filed numerous pretrial motions seeking to suppress certain evidence against the defendant. Defense counsel also was well prepared for trial, as demonstrated by his meaningful cross-examination of the State's most important witnesses. We therefore do not believe that the defendant received the ineffective assistance of trial counsel.

### C. Motion to Suppress Defendant's Statement

The defendant's final contention on appeal is that the trial court erred in denying his motion to suppress his statement. Specifically, the defendant argues that his statement was involuntary because it was the result of police trickery. The defendant further contends that the totality of the circumstances surrounding his statement demonstrates that it was not given voluntarily.

Admitting an involuntary confession into evidence violates the fifth amendment to the United States Constitution (U.S. Const., amend. V) and article I, section 10, of the Illinois Constitution of 1970 (Ill. Const. 1970, art. I, §10). People v. Nicholas, 218 Ill. 2d 104, 118 (2005). A confession is voluntary if it is the product of free will, rather than the product of the inherently coercive atmosphere of the police station. People v. Willis, 215 Ill. 2d 517, 535 (2005). To determine whether the defendant's confession was voluntary, we consider the totality of the circumstances surrounding it, including the defendant's age, intelligence, education, experience, and physical condition at the time of the detention and interrogation; the duration of the interrogation; the presence of Miranda warnings; the presence of any physical or mental abuse; and the legality and duration of the detention. Nicholas, 218 Ill. 2d at 118. Where a juvenile is concerned, additional factors to consider include the time of day when the questioning occurred and whether a parent or other adult concerned about the juvenile's welfare was present during questioning. People v.

Gonzalez, 351 Ill. App. 3d 192, 201 (2004). No one factor is dispositive. People v. Pogue, 312 Ill. App. 3d 719, 727 (1999).

This court reviews the trial court's fact determinations for manifest error, and we review de novo its ultimate decision on the motion to suppress. Nicholas, 218 Ill. 2d at 116.

At the time of his questioning, the defendant was 16 years old. The trial court found that the defendant was of average intelligence, did not have any mental disabilities, and had been in special education classes. The trial court also noted that the defendant did not appear confused in his interactions with the police and that he answered questions appropriately. The defendant was read his Miranda rights. The defendant had also had his Miranda rights read and explained to him on at least two previous occasions. See Gonzalez, 351 Ill. App. 3d at 202 (finding that the juvenile defendant's prior arrests and receipt of Miranda warnings supported determination that the defendant understood the Miranda rights that he was waiving in the instant case). The defendant acknowledged that he understood these rights and that he was waiving them. This acknowledgment was witnessed by the defendant's mother. There is no indication that the defendant was physically or mentally abused while in police custody. The police had probable cause to detain the defendant. Further, the duration of the interrogation of the defendant was relatively short. The defendant was accompanied by his mother throughout the interrogation. The first interview of the defendant began at 10:30 a.m. and lasted 85 minutes, not including a short break requested by the defendant's mother. The second interview began at 6:45 p.m. and lasted only 33 minutes. All of these circumstances indicate that the statement the defendant gave to the police was voluntary. See Nicholas, 218 Ill. 2d at 116.

The defendant maintains that his statement was involuntary because it was the result of police trickery. The defendant argues that the police tricked him into giving his statement by lying that (1)

"several" people had implicated him in the victim's murder and (2) his fingerprints had been found on the murder weapon.

Officer Spayth acknowledged that he was not truthful with the defendant when he indicated that "several" people had implicated him in the victim's murder. In fact, only Proctor had implicated the defendant. We do not condone Officer Spayth's comment. However, there is no indication that Officer Spayth's comment tricked the defendant into making a statement. After Officer Spayth's comment, the defendant continued to deny his involvement in the victim's death. The defendant did not admit any involvement until after he saw Proctor's videotaped statement. Thus, we cannot find that the defendant's statement was involuntary. See People v. Martin, 102 Ill. 2d 412, 427 (1984) (explaining that police deception does not invalidate a confession as a matter of law but rather is only one factor to consider when making a determination of voluntariness).

We also find that Officer Spayth misled the defendant when he told him that the defendant's fingerprints had been found on the baseball bat. At the suppression hearing, Officer Spayth testified as follows:

"Q. Now, also at that point did you tell him that you had fingerprints and other evidence on the scene that were implicating him?

A. I said there was the fingerprint evidence, and the other evidence on the scene would be implicating him, that we knew that he was there, is what I told him.

Q. Okay. Did you tell him that the fingerprints and other evidence on the scene were telling you that as well, that he was involved?

A. Correct."

At trial, Officer Spayth testified:

-20-

"I had explained to him, you know, there is evidence on the scene, there is fingerprints on the scene that are showing us that you were there, that, you know what is going on here.

* * *

I said, listen, the fingerprints are going--there is going to be fingerprints on the bat."

The record reveals that no fingerprints had been recovered at the time Officer Spayth made these comments. However, even after Officer Spayth made the comments, the defendant continued to deny his involvement in the murder. Because the defendant did not make any inculpatory statements due to Officer Spayth's comments, this is not a sufficient basis to suppress the defendant's statement.

The defendant also raises several other arguments as to why his statement was involuntary. Specifically, the defendant contends that his statement was involuntary because (1) during his statement, there was not a neutral juvenile officer present at all times; (2) the police did not share with him exculpatory evidence that suggested he was not responsible for the victim's murder; (3) he was not informed that he could be tried as an adult until after he had already given part of his statement; (4) he was not allowed to speak with his mother before the questioning began; (5) there was no evidence that he was offered food or beverages during the interviews; and (6) his statement was never reduced to writing.

The defendant argues that his statement was involuntary because the juvenile officers did not properly perform their roles during the interrogation. The defendant contends that Officer Carter did not properly perform his role in the first interview, because he said and did nothing to protect the defendant when Officer Spayth "lied." The defendant further contends that Officer Wallers did not

properly perform his role during the second interview, because he "may have questioned" the defendant during that interview.

The Juvenile Court Act of 1987 requires that a parent or a guardian and a juvenile officer are to be notified when a minor is taken into custody. 705 ILCS 405/2--6(a) (West 2004). There is no requirement that a juvenile officer be present when a minor is questioned, although it is a significant factor in the totality of the circumstances analysis. People v. Griffin, 327 Ill. App. 3d 538, 547 (2002). Ultimately, in determining whether a juvenile defendant's statement is reliable and admissible, the court should consider whether the defendant had an opportunity to confer with an interested adult, either a parent or a juvenile officer. People v. Montanez, 273 Ill. App. 3d 844, 854 (1995).

We do not believe that the conduct of either juvenile officer during the interrogation of the defendant was improper. We also note that the defendant's mother was present during the interviews and that the defendant was able to confer with her throughout those interviews. The defendant's contention is therefore without merit. See Montanez, 273 Ill. App. 3d at 854; see also In re R.T., 313 Ill. App. 3d 422, 429 (2000) (whether a juvenile suspect is able to confer with a parent is a material factor in determining whether the suspect's statement is voluntary).

The defendant next contends that his statement was involuntary because the police did not share exculpatory evidence with him. Relying on In re Lashun H., 284 Ill. App. 3d 545, 556 (1996), the defendant argues that the failure of the officers to share such information is a factor to take into consideration as to the voluntariness of his statement. We agree that this is a valid factor to consider. It is evident, however, that the police were questioning the defendant based on the statements that they had received from Proctor. A main thrust of their questioning therefore was whether the

defendant was able to refute Proctor's allegations of murder. The police were also acting quickly to solve a murder that had been discovered only one day earlier.

Next, we find without merit the defendant's argument that his statement was involuntary because he was not informed that he could be tried as an adult until after he had given part of his statement. It is well settled that the police had no obligation to share this information with the defendant. See People v. Prude, 66 Ill. 2d 470, 476 (1977) (explaining that a juvenile's incriminating statement is not rendered involuntary simply because the police did not tell the juvenile that he could be tried as an adult); People v. Brown, 301 Ill. App. 3d 995, 1003 (1998) (explaining that a juvenile suspect does not have the right to be informed of the specific criminal offense or potential criminal offenses for which he may be charged when questioned by the police).

We also find without merit the defendant's contention that his statement was involuntary because he was not allowed to consult with his mother before he was interviewed. There is no per se rule that a juvenile must be afforded the opportunity to consult with a parent or other concerned adult before being interviewed by police. See In re G.O., 191 Ill. 2d 37, 55 (2000). Moreover, the record reveals that the defendant was provided ample opportunities to consult with his mother. The defendant's mother was at home when the defendant was arrested. She was present when he was informed of his Miranda rights, and she signed a form that acknowledged he was waiving those rights. The defendant's mother was with him throughout the interrogations.

The defendant is also not entitled to any relief based on his claim that there was no proof that he was ever offered food or drink during the interviews. See G.O., 191 Ill. 2d at 54 (factor to consider as to whether defendant's statement was voluntary was whether he was given food or beverages or whether he was allowed to use a bathroom during questioning). First, the interviews at issue herein were relatively short. The first interview, in which the defendant gave his inculpatory

statement, began at 10:30 a.m. and lasted only 85 minutes. The second interview lasted only 33 minutes. There is no indication that hunger or duress was a contributing factor in the defendant making his statement.

Finally, the defendant is also not entitled to any relief based on his claim that his statement was not reduced to writing. This is but one factor to consider in determining whether the defendant's statement was voluntary. See In re J.J.C., 294 Ill. App. 3d 227, 236 (1998). In considering the totality of the circumstances, including the defendant's previous experience with the criminal justice system, his ability to understand his Miranda rights, and his being accompanied by his mother throughout the interrogation, it is apparent that the defendant's statement was made freely and without compulsion. See People v. McDaniel, 326 Ill. App. 3d 771, 781 (2001). The trial court therefore did not err in denying the defendant's motion to suppress his statement.

## III. CONCLUSION

For the foregoing reasons, we affirm the judgment of the circuit court of Kane County.

Affirmed.

BOWMAN and O'MALLEY, JJ., concur.