THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RENE AMIGON, Defendant-Appellant.

First District (1st Division)    No. 1—06—3528

Opinion filed February 18, 2009.

Jed Stone and John Curnyn, both of Stone & Associates, L.L.C., of Waukegan, for appellant.

Anita Alvarez, State's Attorney, of Chicago (James E. Fitzgerald, Manny Magence, and Heather Fahrenkrog, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GARCIA delivered the opinion of the court:

The defendant, Rene Amigon, was convicted of the murder of Alphonso Ruiz, who died of pneumonia more than five years after he was shot and paralyzed by the defendant. The defendant contends (1) his nonelectronically recorded custodial statement should not have been admitted at trial, and (2) the State failed to prove causation. We affirm.

## BACKGROUND

At a prior trial, the defendant was convicted of the murder of Enson Rodriguez and the aggravated battery with a firearm of Alphonso Ruiz. There, the State proved that on October 20, 1995, the defendant, an 18-year-old member of the Latin Kings street gang, shot at Rodriguez and Ruiz, both members of the Two-Six, a rival gang. The State's evidence included testimony from Ruiz and the court-reported statement the defendant made on October 27, 1995. The defendant received a 30-year sentence for aggravated battery with a firearm for the Ruiz shooting. The record does not reveal his murder sentence.

Although Ruiz survived the shooting, a bullet severed his spinal cord, rendering him quadriplegic. In early 2001, he was living with family members, taking college classes, and learning to drive a handicap-modified car. On March 13, 2001, Ruiz went into cardiac arrest. He was taken to the hospital, where he died the following day of pneumonia. He was 22 years old.

Upon learning of Ruiz's death, the State charged the defendant with Ruiz's murder pursuant to sections 9—1(a)(1) and 9—1(a)(2) of the Criminal Code of 1961 (720 ILCS 5/9—1(a)(1), (a)(2) (West 2000)).[1]

---

[1] A codefendant who was not part of his trial and is not party to this appeal was charged with the defendant.

Prior to his murder trial, the defendant moved to suppress his 1995 court-reported statement on the basis that it did not comply with section 103—2.1(b) of the Code of Criminal Procedure of 1963 (725 ILCS 5/103—2.1(b) (West 2006)) because it was not electronically recorded. The court denied the motion.

The defendant's murder trial commenced on September 26, 2006.[2] Two eyewitnesses—a nurse who had been on her way to work and a Two-Six gang member—identified the defendant as Ruiz's shooter, who was wearing a sweatshirt at the time. The State introduced Ruiz's testimony from the prior trial that established that while Ruiz was talking to Rodriguez on October 20, 1995, he saw a Hispanic male wearing a hooded sweatshirt pull out a gun and fire five shots at them. The State also introduced the defendant's 1995 statement in which he admitted he shot Ruiz because he knew Ruiz was a Two-Six member and Two-Six members had recently vandalized the defendant's car.

To establish Ruiz's 2001 death was caused by the 1995 shooting, the State presented expert forensic pathology testimony from Dr. Nancy Jones, the assistant medical examiner that conducted an autopsy of Ruiz.

Dr. Jones explained that pneumonia is an infection in the lungs that reduces a person's ability to exchange air. Ruiz's pneumonia was caused by a "community acquired" bacteria, meaning Ruiz contracted the bacteria prior to being admitted to the hospital on March 13, 2001. There was no way for Dr. Jones to determine how Ruiz contracted the pneumonia-causing bacteria.

In Dr. Jones's opinion, Ruiz "died as a result of pneumonia due to quadriplegia due to a gunshot wound to the neck." Her opinion was not altered by the fact that Ruiz's spinal cord injury occurred more than five years before his death. Dr. Jones explained how the prior gunshot wound was significant to the pneumonia:

"Well, the reason it's significant to the pneumonia is, we need an intact nervous system in order to breathe adequately and to prevent ourselves from developing pneumonia or infections. We need to be able to take deep breaths, filling our lungs. And we need to be able to expel that air completely because any time we can't completely empty out the lungs, it allows for secretions, mucosa, saliva to accumulate in the lungs, typically in the lower lungs, and it becomes a growth media for bacteria. So anything that can compromise your ability to breathe is going to increase [y]our risk for developing pneumonia.

---

[2]Facts regarding Rodriguez's murder were omitted at trial.

The other thing about it is, that individual who has paralysis or quadriplegia or paraplegic from injuries to their spinal column also begin to undergo medical wasting. They become thinner and their immune systems become compromised because of that muscle wasting, that inability to move and get around adequately. So individuals with damage to the spinal cords are compromised [respiratory]-wise because they can't breathe as adequately, but they're also compromised because their immune system isn't as strong as it would normally be in an individual who didn't have those problems."

Dr. Jones also explained the nerves in Ruiz's third, fourth, and fifth vertebrae that controlled his diaphragm for breathing had been damaged in the shooting. Thus, "Ruiz's ability to expand his lungs regularly or completely and fully for normal pulmonary toilet" was reduced.

Essentially, "Ruiz acquired a bacterial pneumonia in the community *** because he was a quadriplegic, had atrophy and muscle wasting and his respi[ra]tory capabilities were compromised because the gunshot wound made him more susceptible [to pneumonia] than a normal 22 year old would be." In her opinion, to a reasonable degree of medical certainty, the manner of Ruiz's death was homicide.

On cross-examination, Dr. Jones acknowledged the pneumonia "probably" was not connected with anything the defendant did or did not do. She also testified that several of the victim's organs, including his heart, kidneys, and pancreas, were harvested for transplant. His lungs were not.

After the jury found the defendant guilty of murder, the trial court sentenced him to a mandatory term of natural life in prison. This timely appeal followed.

## ANALYSIS

### I. Electronically Recorded Statement

The defendant first contends the trial court erred in admitting his 1995 court-reported statement at trial. According to the defendant, his statement should have been presumed inadmissible because it was not electronically recorded as required by section 103—2.1(b) of the Code of Criminal Procedure of 1963 (725 ILCS 5/103—2.1(b) (West 2006)).

Section 103—2.1(b) provides:

"An oral, written, or sign language statement of an accused made as a result of a custodial interrogation at a police station or other place of detention shall be presumed to be inadmissible as evidence against the accused in any criminal proceeding brought under Section 9—1 *** of the Criminal Code of 1961 *** unless:

"(1) an electronic recording is made of the custodial interrogation; and

(2) the recording is substantially accurate and not intentionally altered." 725 ILCS 5/103—2.1(b) (West 2006).

An electronic recording "includes motion picture, audiotape, or videotape, or digital recording." 725 ILCS 5/103—2.1(a) (West 2006). There are numerous exceptions to the electronic recording requirement. 725 ILCS 5/103—2.1(e) (West 2006).

Section 103—2.1, approved in 2003, became effective on July 18, 2005, almost 10 years after the defendant's court-reported statement was taken, but more than one year before this murder trial commenced. We understand the defendant to claim that the date of this murder trial triggers the application of section 103—2.1. We understand the State to claim that section 103—2.1 has no application here because the date of the defendant's custodial interrogation predates the passage of the section.

Because this issue involves whether section 103—2.1(b) initially bars the admission of the defendant's statement, a legal challenge, our review is *de novo*. *People v. Sutherland*, 223 Ill. 2d 187, 197, 860 N.E.2d 178 (2006) (the ultimate issue of a defendant's "legal challenge" to the denial of a motion to suppress is reviewed *de novo*).

"Where, as here, a case implicates a statute enacted after the events giving rise to the litigation, Illinois courts evaluate the temporal reach of the new law in accordance with the standards set forth by the United States Supreme Court in *Landgraf v. USI Film Products*, 511 U.S. 244, 128 L. Ed. 2d 229, 114 S. Ct. 1483 (1994)." *People v. Brown*, 225 Ill. 2d 188, 201, 866 N.E.2d 1163 (2007). Where the legislature expressly provides for the delayed implementation of a statute, the legislature expresses its intent that the statute apply prospectively only. *People v. Gilbert*, 379 Ill. App. 3d 106, 111, 882 N.E.2d 1140 (2008), citing *Brown*, 225 Ill. 2d at 201.

The defendant argues the legislature's use of the phrase "in any criminal proceeding" indicates the legislature intended section 103—2.1(b) to apply in all murder cases tried after the section's effective date, even those like his where the statement was taken prior to the date the statute went into effect. He points to *People v. Johnson*, 368 Ill. App. 3d 1073, 859 N.E.2d 153 (2006), which, in his view, requires this court "to analyze the admissibility of the statement under the statute" even where the statement is made prior to the statute's effective date.

The defendant in *Johnson* was a juvenile indicted in May 2003 as an adult for murder. The juvenile gave an inculpatory statement after he was confronted with a videotaped statement of a co-arrestee. While

the co-arrestee's statement was videotaped, it is unclear whether the juvenile's statement was electronically recorded. *Johnson*, 368 Ill. App. 3d at 1076-78. The defendant challenged the admission of his statement as involuntary prior to trial. The trial court denied the motion.

The reviewing court found no error in admitting the juvenile's inculpatory statement based on the totality of the circumstances, including in part, that the duration of the interrogation was relatively short. *Johnson*, 368 Ill. App. 3d at 1087. In so finding, the court rejected the defendant's numerous contentions of involuntariness, including that the statement was the result of police trickery and that the statement was not reduced to writing. *Johnson*, 368 Ill. App. 3d at 1091. The only mention the court made to the electronic recording requirement of section 103—2.1 was in the footnote explaining that the defendant's statement was made prior to the effective date of section 103—2.1 and a similar provision of the Juvenile Court Act of 1987 (705 ILCS 405/5—401.5 (West 2004)). *Johnson*, 368 Ill. App. 3d at 1078 n.1.

■ Based on our reading of *Johnson*, we disagree with the defendant's contention that *Johnson* requires us "to analyze the admissibility of the statement under the statute" where the statement was made prior to the statute's effective date. There is nothing in *Johnson* that dictates that analysis here. The defendant presents no authority to support his claim that section 103—2.1(b) applies in his case where the complained-of statement was taken prior to the effective date of the section. In the absence of such authority, we hold the statute's electronic recording requirement only applies as of the effective date of the statute. We so hold for two reasons.

First, we find support that the statute applies only to custodial interrogations that take place on or after the effective date of the statute based on the holding in *People v. Buck*, 361 Ill. App. 3d 923, 942-43, 838 N.E.2d 187 (2005). In *Buck*, the defendant challenged the reliability and credibility of his interrogation statement before the jury. To guide the jury in assessing the reliability of his statement, the defendant tendered modified versions of Illinois Pattern Jury Instructions, Criminal, No. 3.06—3.07 (4th ed. 2000) (hereinafter IPI Criminal 4th No. 3.06—3.07), based on section 103—2.1(b), which was not in effect at the time of his interrogation. *Buck*, 361 Ill. App. 3d at 941-42. The trial court rejected the tendered instructions and we affirmed. This court held the defendant was not entitled to jury instructions, which according to the defendant shared " 'commonality of purpose [with] section [103—2.1(b)].' " *Buck*, 361 Ill. App. 3d at 942. We upheld use of the unmodified versions of IPI Criminal 4th No.

3.06—3.07 because the "essence of the refused instructions [was] covered" by the instructions given. *Buck*, 361 Ill. App. 3d at 943. We also noted that "recommendation 58 of the Report of the Governor's Commission on Capital Punishment (Report of the Governor's Commission on Capital Punishment, ch. 9, at 133-34 (April 2002)), which recommends the addition to IPI Criminal 4th No. 3.06—3.07 of language regarding the reliability of electronically recorded confessions" had not been approved. *Buck*, 361 Ill. App. 3d at 945. Because section 103—2.1(b) was not in effect and the recommendation to modify IPI instructions had not been adopted, we accepted the State's argument "that the trial court gave the jury the only instruction required by law, *i.e.*, the unmodified version of IPI Criminal 4th No. 3.06—3.07." *Buck*, 361 Ill. App. 3d at 942. *Buck* is consistent with our holding that section 103—2.1(b) did not impose responsibility on a police agency regarding the recording of police interrogations until the statute became law.

Second, the legislature enacted section 103—2.1(b) in 2003 but did not make it effective until 2005. This delayed implementation demonstrates not only that it was the intent of the legislature that the statute apply prospectively (*Gilbert*, 379 Ill. App. 3d at 111, citing *Brown*, 225 Ill. 2d at 201), but that police agencies needed time to arrange for electronic devices to comply with the statute. If a police agency was not mandated to use an electronic device to record a custodial interrogation in a murder case immediately upon passage of the statute and, according to the defendant's claim here, the custodial interrogation statement would not be presumptively inadmissible if such a murder trial took place before the effective date, we fail to see how such a requirement could reasonably be imposed regarding a custodial interrogation that took place years before.

We reject the defendant's broad reading of the phrase "in any criminal proceeding" in section 103—2.1(b) as support for his argument that the presumption of inadmissibility arises under the section as of the date of the trial proceedings. For a variety of reasons, the trial of an accused charged with murder may be delayed long after his police interrogation; this case is one such example. The section's clear aim is to encourage the electronic recording of custodial interrogations by police in murder cases, beginning with the effective date of the statute.

■ We conclude the legislature intended to have the statute apply only to nonelectronically recorded confessions taken on or after the statute's effective date. The plain language of the statute expresses the legislature's intent that the rebuttable presumption of the inadmissibility of custodial interrogations in murder cases did not arise until

July 18, 2005. Accordingly, the trial court did not err in denying the defendant's motion to suppress his confession.

## II. Causation Evidence

The defendant next contends the State failed to prove he caused Ruiz's death. The defendant argues the remoteness in time and place between his act of shooting Ruiz in 1995 and Ruiz's death of pneumonia in 2001 breaks the causal chain. He also asserts Ruiz's death by pneumonia was unforeseeable.

When a defendant challenges the sufficiency of the evidence, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Collins*, 106 Ill. 2d 237, 261, 478 N.E.2d 267 (1985), quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789 (1979).

One element the State must prove in a murder case is causation. *People v. Gulliford*, 86 Ill. App. 3d 237, 240, 407 N.E.2d 1094 (1980). Causation is ordinarily determined by the fact finder. *People v. Brackett*, 117 Ill. 2d 170, 176, 510 N.E.2d 877 (1987), citing *People v. Martin*, 112 Ill. App. 3d 486, 500, 445 N.E.2d 795 (1983). We will only disturb this finding where the evidence "is so unreasonable, improbable and unsatisfactory as to leave a reasonable doubt as to defendant's guilt." *Brackett*, 117 Ill. 2d at 177; *People v. Lara*, 289 Ill. App. 3d 675, 679, 683 N.E.2d 480 (1997).

While the State must prove beyond a reasonable doubt that the defendant's actions caused the victim's death (*Brackett*, 117 Ill. 2d at 176; *Lara*, 289 Ill. App. 3d at 680), it need not prove the defendant's acts were the "sole and immediate cause of death" (*Brackett*, 117 Ill. 2d at 176; *People v. Reader*, 26 Ill. 2d 210, 213, 186 N.E.2d 298 (1962)). Rather, the State must only prove the defendant's criminal acts proximately contributed to the victim's death. *Brackett*, 117 Ill. 2d at 176; *Gulliford*, 86 Ill. App. 3d at 240; *Lara*, 289 Ill. App. 3d at 680. Stated differently, a defendant will be found criminally liable where his or her criminal acts "set in motion a chain of events" culminating in the victim's death. *Brackett*, 117 Ill. 2d at 176. However, "an intervening cause completely unrelated to the acts of the defendant" will relieve the defendant of criminal liability. *Brackett*, 117 Ill. 2d at 176; *Gulliford*, 86 Ill. App. 3d at 241; see also *People v. Brown*, 57 Ill. App. 3d 528, 531, 373 N.E.2d 459 (1978) ("The State's burden is not to prove that the defendant's act is the sole and immediate cause of death, but that the defendant's act was, beyond a reasonable doubt, a contributing cause to a death such that the death did not result from a source unconnected with the defendant's act").

In cases where the causal chain is not readily apparent, expert medical testimony may assist the trier of fact in determining whether the defendant's acts contributed to the victim's death. *Brackett*, 117 Ill. 2d at 177. In *Brackett*, for example, our supreme court held the State sufficiently proved the defendant's acts of raping and beating the 85-year-old victim contributed to her choking death five days later. Expert testimony established the victim choked because her ability to dislodge food from her trachea had been compromised by a broken rib she suffered during the attack, which affected her ability to breathe deeply. Further, the victim could not be fed in a manner to avoid the possibility of choking, such as through a nasal feeding tube, because of the significant facial injuries she suffered in the attack. Expert medical testimony established that "the victim's depressed, weakened, debilitated state was the direct result of the trauma associated with the attack upon her." *Brackett*, 117 Ill. 2d at 178. The court noted that "so long as the defendant's acts contributed to the death there is still sufficient proof of causation, despite the preexisting health condition." *Brackett*, 117 Ill. 2d at 178. The defendant's murder conviction was affirmed.

In *Brown*, on the other hand, the defendant's murder conviction was reversed where the medical evidence failed to establish the defendant's stabbing caused the victim's death. In that case, the victim was hospitalized shortly after the stabbing. She was released a week later. Three days after her release, she was readmitted to the hospital after a wound opened. That night, she died. At trial, her treating physician testified the cause of death was a pulmonary embolism—the lodging of a blood clot in the main artery of her lung. Because the victim did not suffer other risk factors associated with blood clots, the doctor concluded the clot originated from the victim's stab wound site and traveled to her lung, causing her death.

The reviewing court held the State failed to prove the "essential causative relationship between" the defendant's act and the victim's death. *Brown*, 57 Ill. App. 3d at 532. The court reasoned there was no factual support for the doctor's opinion that the blood clot originated at the wound site, such as evidence from an autopsy, a relationship between the victim's death and the defendant's acts, or "explanations of the reasons underlying the cause of death." *Brown*, 57 Ill. App. 3d at 533. Without such facts, the relationship between the defendant's actions and the victim's death was purely speculative. *Brown*, 57 Ill. App. 3d at 532.

In this case, Dr. Jones opined that Ruiz's death resulted from "pneumonia due to quadriplegia due to a gunshot wound to the neck." In her expert opinion, Ruiz's quadriplegia, a direct result of the shoot-

ing, weakened his immune system and compromised his ability to expel air, thereby increasing his risk for pneumonia. Her testimony established a direct relationship between the gunshot wound and the pneumonia that ultimately took his life. Ruiz's paralyzed state made it difficult for him to breathe completely and weakened his immune system, thereby making him more susceptible to the pneumonia that a "normal" 22-year-old would have survived. Here, as in *Brackett*, the evidence established the defendant, through his criminal acts, "set in motion a chain of events" culminating in Ruiz's death. *Brackett*, 117 Ill. 2d at 176.

Unlike in *Brown*, there is no evidentiary gap between the cause of death and the defendant's criminal act. The defendant's act of shooting the victim rendered the victim a quadriplegic. Dr. Jones's opinion, taken in the light most favorable to the State, established that but for the victim's quadriplegia, the victim would not have succumbed to pneumonia. At autopsy, Dr. Jones viewed Ruiz's gunshot wound and the resulting damage to his spinal column, including the area that controlled his breathing. She also observed that Ruiz experienced muscle wasting due to his quadriplegia. Her testimony was not speculative as to the link between the quadriplegia and the community-acquired pneumonia.

Notably, other courts in this state have affirmed murder convictions where medical evidence shows the victim died of subsequently acquired pneumonia. See *Gulliford*, 86 Ill. App. 3d at 239, 242 (holding the defendants' actions of striking the victim on the head with a metal pipe set in motion a chain of events eventually culminating in the victim's death of pneumonia five days later while recovering from brain surgery where expert medical testimony established the pneumonia was "probably" caused by the victim's comatose state that resulted from his head wound); see also *Reader*, 26 Ill. 2d at 213 (affirming the defendant's murder conviction where medical evidence showed he died of pneumonia that he contracted while recovering in the hospital from a gunshot wound).

The defendant emphasizes the prolonged time period between Ruiz's shooting in 1995 and his death in 2001 to challenge the proof of causation. While this case differs substantially from the above cases based on the length of time between the defendant's criminal acts and the victim's death, we know of no authority holding that a lengthy passage of time, standing alone, breaks the causal chain. See *People v. Kennedy*, 150 Ill. App. 3d 319, 324, 501 N.E.2d 1004 (1986) (a 5½-day period between the victim's stabbing and his death, "without more," is insufficient to relieve the defendant from responsibility for having stabbed the victim to death). In fact, *Brown*, the case most relied on by the defendant, states "[t]he existence of a time interval between

the defendant's act and death does not preclude such a causal link [citation]; this is true even where, during this interval, there has been an apparent recovery from the injuries inflicted. [Citation.]" *Brown*, 57 Ill. App. 3d at 531-32. Murder prosecutions are not unheard of even where there has been an extended time interval between the defendant's acts and the victim's death. See, *e.g.*, *People v. Carrillo*, 164 Ill. 2d 144, 146, 646 N.E.2d 582 (1995) (neither double jeopardy nor collateral estoppel barred the defendants' prosecutions for the victim's death where the victim "languished for nine years" after being shot and paralyzed); *People v. Slywka*, 365 Ill. App. 3d 34, 847 N.E.2d 780 (2006) (where the defendants were indicted for murder upon the victim's death eight years after his shooting).

The defendant also argues it was unforeseeable that Ruiz, who underwent extensive rehabilitation, was taking college classes, and was learning to drive, would contract bacterial pneumonia and die more than five years after the shooting. It is true that "the concept of foreseeability of the ensuing harm caused from the culpable act of a defendant plays a large role" in criminal matters. *Gulliford*, 86 Ill. App. 3d at 241. However, the defendant need not be able to foresee "the exact manner in which the victim would die." *Brackett*, 117 Ill. 2d at 180. Here, while it was not foreseeable that the victim would expire of pneumonia, it was completely foreseeable that the victim's severed spinal cord, caused by the bullet shot by the defendant, would severely compromise the victim's body. In this case, as Dr. Jones testified, the compromised state of the victim's body led to his being unable to fight off pneumonia as a "normal" 22-year-old would.

Neither the lack of foreseeability that the victim would die of pneumonia nor the defendant's lack of connection to the ultimate cause of death undermines the defendant's conviction of murder. The State proved causation beyond a reasonable doubt.

## CONCLUSION

The defendant's nonelectronically recorded custodial statement was properly admitted at trial where section 103—2.1 was not in effect at the time of his custodial interrogation. The State proved causation to support the defendant's conviction of murder where the defendant's criminal act rendered the victim quadriplegic, which in turn compromised the victim's ability to fight off pneumonia, which ultimately caused his death. The judgment of the circuit court of Cook County is affirmed.

Affirmed.

WOLFSON and HALL, JJ., concur.